**SUNCOR ENERGY (USA), INC.,**
**a Delaware corporation,**
**Plaintiff–Appellee,**

v.

**ASPEN PETROLEUM PRODUCTS,**
**INC., a Colorado corporation,**
**Defendant–Appellant.**

**No. 06CA1925.**

Colorado Court of Appeals,
Div. I.

Dec. 27, 2007.

As Modified on Denial of Rehearing
Feb. 14, 2008.

Holland & Hart, LLP, Rick D. Bailey, Danielle R. Voorhees, Greenwood Village, Colorado, for Plaintiff–Appellee.

Benson & Case, LLP, John Case, Ronnie Fischer, Denver, Colorado, for Defendant–Appellant.

Opinion by Judge CASEBOLT.

In this bad check dispute, defendant, Aspen Petroleum Products, Inc., appeals the summary judgment in favor of plaintiff, Suncor Energy (USA), Inc. We affirm and remand for an award of appellate attorney fees and costs.

The following facts are undisputed. Defendant bought gasoline and diesel fuel from plaintiff, the owner of an oil refinery, and resold it to independent retailers. When defendant purchased fuel, it had ten days after invoicing to pay the balance due.

Defendant's president signed three checks to pay three separate invoices: Check number 5180 dated May 10, 2005, for $43,506.76; check number 5181, also dated May 10, 2005, for $94,528.12, and check number 854, dated May 17, 2005, for $54,401.68. Defendant's bank dishonored the checks.

In accordance with section 13–21–109, C.R.S.2007 (bad check statute), plaintiff notified defendant of its intent to proceed under that statute and complied with all its notice requirements. Although defendant did not dispute the amount owing, it failed to pay the balance due for the dishonored checks within the fifteen-day period mandated by the bad check statute. Accordingly, plaintiff initiated this action seeking to recover treble damages and attorney fees under section 13–21–109(2)(a) & (6), C.R.S.2007.

When plaintiff moved for summary judgment, defendant asserted a statutory defense under section 13–21–109(2)(b)(I), C.R.S.2007, which provides that the maker of a check is not liable for three times the face amount of the check if the maker had sufficient funds in its account "to cover the check ... at the time the check ... was made, plus all other checks ... on the account then outstanding and unpaid." Defendant asserted that it had sufficient funds in the account when it mailed the checks.

The trial court concluded that on the dates the checks were written, defendant did not have sufficient funds to cover the three checks and all other outstanding and unpaid checks upon the account. The court awarded treble damages and attorney fees to plaintiff, and this appeal followed.

I.

Defendant asserts the trial court erred in determining that a check is "made," for the purposes of applying the defense set forth in section 13–21–109(2)(b)(I), on the date that appears on the face of the check. Instead, it asserts, a check is "made" on its date of delivery, which defendant asserts was the date of mailing. We disagree.

We first reject plaintiff's assertion that defendant is raising this argument for the first time on appeal. In response to plaintiff's motion for summary judgment, defendant asserted that there were sufficient funds in its account "to pay the checks when they were issued." The argument was likewise raised at the trial on the remaining issues and before the trial court issued its final judgment. We conclude that this is sufficient to preserve the matter.

We review the trial court's grant of summary judgment de novo. *Credit Service Co. v. Dauwe*, 134 P.3d 444, 445 (Colo.App.

2005). Summary judgment is appropriate when the pleadings and supporting documentation demonstrate that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. *Id.*

▉ In construing a statute, our primary duty is to give effect to the intent of the General Assembly and adopt the statutory construction that best effectuates the purposes of the legislative scheme, looking first to the plain language of the statute. *Spahmer v. Gullette*, 113 P.3d 158, 162 (Colo.2005).

▉ To effectuate the legislative intent, a statute must be read and considered as a whole and should be interpreted in a manner that will give consistent, harmonious, and sensible effect to all its parts. *State v. Nieto*, 993 P.2d 493, 501 (Colo.2000). There is a presumption that the General Assembly intends a just and reasonable result when it enacts a statute, and a statutory construction that defeats the legislative intent will not be followed. § 2–4–201(1)(c), C.R.S.2007; *see Frohlick Crane Serv., Inc. v. Mack*, 182 Colo. 34, 37–38, 510 P.2d 891, 892 (1973). If the plain language of the statute is clear and unambiguous, we apply the statute as written, unless it leads to an absurd result. *E–470 Pub. Highway Auth. v. Kortum Inv. Co.*, 121 P.3d 331, 333 (Colo.App.2005).

▉ If the statutory language unambiguously sets forth the legislative purpose, we need not apply additional rules of statutory construction to determine the statute's meaning. *People v. Cooper*, 27 P.3d 348, 354 (Colo.2001). If, however, the statutory language lends itself to alternative constructions and its intended scope is unclear, a court may apply other rules of statutory construction to determine which alternative construction is in accordance with the objective sought to be achieved by the legislation. *People v. Terry*, 791 P.2d 374, 376 (Colo. 1990). If the language of a statute is ambiguous or conflicts with other provisions, we then look to legislative history, prior law, the consequences of a given construction, and the goal of the statutory scheme. *People v. Luther*, 58 P.3d 1013, 1015 (Colo.2002); *Allely v.*

*City of Evans*, 124 P.3d 911, 912–13 (Colo. App.2005).

▉ "We read words and phrases in context and construe them literally according to common usage unless they have acquired a technical meaning by legislative definition." *People v. Yascavage*, 101 P.3d 1090, 1093 (Colo.2004).

Section 13–21–109 does not define the word "made." Defendant asserts that, because it governs negotiable instruments, the Uniform Commercial Code (UCC) should apply. *See Kunz v. Cycles West, Inc.*, 969 P.2d 781, 784–85 (Colo.App.1998)(applying UCC to determine whether a corporate officer was personally liable under the bad check statute). However, there is no definition of the term contained in the UCC, although it does define "maker" as "a person who signs or is identified in a note as a person undertaking to pay." § 4–3–103(a)(5), C.R.S.2007.

We are not aware of any definition of the phrase "to make a check" in case law or in analogous statutes from other jurisdictions. *See, e.g.*, Fla. Stat. § 68.065; Tenn.Code Ann. § 47–29–101. This phraseology appears to be a usage peculiar to the Colorado statute.

Other divisions of this court have looked to the common meanings of the words employed in the bad check statute to define its terms. *See Mountain States Commercial Collections, Inc. v. 99 Cents Liquidators, Inc.*, 940 P.2d 934, 937 (Colo.App.1996) (looking to common meanings in defining the term "any person"); *Stadler v. Devito*, 931 P.2d 573, 576 (Colo.App.1996)(looking to common meaning of "undeliverable"). Consequently, we will look to the commonly understood meaning of the term "made."

According to *Random House Webster's College Dictionary* 815 (1991), "made" is the past tense of the verb "make," which means to cause something to occur or exist, to bring into being, to be created, to carry out an action, to write, or to draw or draft. Hence, "at the time the check . . . was made" means at the time the check was written.

We find additional support for this interpretation in reviewing the language contained in the various versions of the bad check statute.

In 1989 the General Assembly repealed and reenacted the bad check statute. The repealed version of the statute had provided that "whoever . . . willfully or with intent to defraud, in the payment of any obligation, shall make any check . . . knowing at the time of such making, drawing, uttering, or delivering that he has not sufficient funds, or has no account . . . is liable to the holder of such check." Ch. 382, sec. 1, § 41–2–9, 1967 Colo. Sess. Laws 827.

The present version of the statute states that "any person who . . . makes any payment of any obligation . . . by means of making any check . . . which is not paid upon its presentment is liable to the holder of such check." Ch. 131, sec. 1, § 13–21–109(1), 1989 Colo. Sess. Laws 754. In reenacting the statute, the General Assembly did not include the acts of drawing, uttering, or delivering. Instead, it used only the term "making."

"Utter" in this context means to put or send a document into circulation. *Black's Law Dictionary* 1582 (8th ed.2004); *see* § 18–5–101(8), C.R.S.2007 ("utter" means to transfer, pass, or deliver). "Deliver" generally means to transfer possession. *Black's Law Dictionary* 461; *see* § 4–1–201(14), C.R.S.2007 (same definition for "delivery"). These words contemplate acts beyond the mere writing of a check.

In our view, the inclusion of "making" and the exclusion of the noted words indicates that the legislature did not intend the making of a check, as used in this statute, to require that it be delivered, drawn, or uttered.

Defendant nevertheless contends that this interpretation is negated by a provision in the 1989 Act amending the bad check statute. It points out that ch. 131, sec. 7, 1989 Colo. Sess. Laws 757, which sets forth the effective date of the amending Act, states, "This act shall take effect on July 1, 1989, and shall apply to any check, draft, or order written or made on or after said date." Defendant asserts that, if the legislature had intended the word "made" to mean "written," it would not have used the disjunctive phrase "written or made." We reject this assertion.

First, this provision is not contained in the Colorado Revised Statutes and is therefore not considered to be a part of the official statutes of the state. *See* § 2–5–118(1)(a), C.R.S. 2007. Second, even if we were to consider this provision, we would conclude that, at most, it would render the statutory provision ambiguous, thus justifying review of legislative history.

In testimony given at the legislative hearings in 1989, Senator Groff, the Senate sponsor of the bill, explained that the bad check statute "sets out by and large that . . . anyone who *writes* a check . . . is obligated . . . for the face amount of the check, plus any actual damages that may occur." (Emphasis supplied.)

> [I]f you can prove the account has sufficient funds . . . and you can prove you had the money to pay for any outstanding checks plus the one you've *written* at the time you *wrote* them, then you very likely will not be subject to any more than just paying the face amount of the check.

Hearings on H.B. 89–1065, 57th Gen. Assemb., 1st Reg. Sess. (Mar. 17, 1989, 11:28 a.m.)(emphasis supplied).

We accordingly conclude that the General Assembly did not intend that the defense predicated upon when the check was "made" would turn upon the date a check is delivered. Rather, the intent of the legislature from 1989 forward was for "made" to mean written.

For similar reasons, we find defendant's reliance upon several cases to be misplaced.

In *Young v. Township of Clarendon,* 132 U.S. 340, 353, 10 S.Ct. 107, 33 L.Ed. 356 (1889), the Court stated: "The act of delivery is essential to the existence of any deed, bond, or note. Although drawn and signed, so long as it is undelivered it is a nullity; not only does it take effect only by delivery, but also only on delivery." However, the Court earlier stated that the case must be decided with reference to the "exceptional . . . circumstances by which [the] bonds were deprived of their value": "It is not the case of a common negotiable instrument put forth by a natural person as obligor, but is that of a railroad aid bond . . . put forth by the munic-

ipality." *Id.* at 346, 10 S.Ct. 107. Hence, the *Young* Court distinguished the case from conventional cases involving negotiable instruments. Therefore, *Young* is inapposite here.

In *Cowing v. Altman,* 71 N.Y. 435, 441 (1877), the court stated, in pertinent part: "A check or note has no inception until delivery, and for all legal purposes it is to be considered as made on the day it is delivered." There, the court addressed a check issued in violation of a bankruptcy law, for payment to an attorney for compensation in representing the maker in a bankruptcy proceeding. The check in question was, many months later, negotiated to a third party. The main issue in the case was whether the delay in presentment created a presumption of dishonor and whether such a presumption was a defense. Hence, *Cowing* is factually distinguishable from this case. Moreover, the *Cowing* court found the check in question to be illegal and void from the time it was written. Thus, the statement quoted above was dictum.

Finally, defendant relies upon *Galvin v. Stokes,* 68 Colo. 376, 381, 191 P. 117, 119 (1920), in which the court stated: "Our negotiable instrument law expressly provides that every contract on a negotiable instrument is incomplete and revocable until delivery of the instrument, for the purpose of giving effect thereto. This was likewise the rule at common law." However, the *Galvin* case turned upon whether the doctrine of "in pari delicto" was applicable, and the court's quoted statement was made in that context. In addition, the court was determining whether the delivery and cashing of a check was through an unauthorized and willful wrong of the party holding the check; it did not consider when the check was made.

In any event, "delivery" has been deleted from the bad check statute; hence, case law concerning delivery of a check is inapposite.

Defendant nevertheless asserts that our interpretation of the statute would lead to an absurd result. It asserts that this interpretation exposes check makers to potential treble damages liability based on account activity that takes place while a signed and dated check lies on the maker's desk. We disagree.

First, the statute authorizes a check's "holder" to claim treble damages. One cannot become a holder until the check is received. Undelivered checks, by definition, cannot give rise to any liability.

Second, the statute requires that a check be dishonored by the drawee bank before a claim may arise. A check lying on the maker's desk undelivered cannot be dishonored.

Third, the statute requires that written notice of nonpayment must be given and prescribes a fifteen-day cure period before a holder may seek treble damages. Thus, merely negligent check writers who erroneously compute their account balance may cure mathematical and other similar errors before their liability is trebled by paying the amount due within the fifteen-day grace period. And even those who intentionally write checks relying upon the "float" between the time of sending a check and the time of its presentment are granted this safe harbor if their calculations prove faulty.

Indeed, if we were to interpret the statute as urged by defendant, that reading would itself create a complicated and convoluted statutory scheme that would lead to an absurd result. If a check is "made" when delivered, there would likely be substantial problems of proof under the statute. Absent some additional evidence, courts and litigants could not analyze what checks were outstanding and whether there were sufficient funds in the account because neither the checks nor a check statement would show the date of delivery. Resort to extraneous proof could assist if a check maker has mailed or sent every check with a request for a receipt showing its date of mailing, or if the recipient retains an envelope with a postmark. However, such information would not be available in many instances.

For these reasons, we conclude that the trial court did not err in determining that defendant "made" the checks at issue here on the date they were written.

## II.

 Defendant asserts that the trial court erred in granting summary judgment

 

because there were genuine issues of material fact whether it had sufficient funds in its account. We disagree.

First, to the extent this argument is premised upon an assertion that the checks were made on the date they were mailed, we reject it in light of our conclusion above.

Moreover, to the extent that the affidavit of defendant's president attempts to assert that there were sufficient funds in the account at the time the checks were written, we reject that assertion because the affidavit is conclusory.

A conclusory statement made without supporting documentation or testimony is insufficient to create an issue of material fact. *See Olson v. State Farm Mut. Auto. Ins. Co.,* 174 P.3d 849 (Colo.App.2007); *Keith v. Kinney,* 140 P.3d 141, 153 (Colo.App.2005).

Here, the affidavit of defendant's president states a bare conclusion that the "account contained sufficient funds to cover the checks at the time the checks were made, plus all other checks … on the account then outstanding and unpaid." However, there is no reference to the account statement, nor a summary of each check or deposit, nor are there any other facts presented to justify that assertion. Accordingly, we reject this contention.

### III.

Defendant asserts that the trial court erred in awarding attorney fees. We disagree.

Section 13–21–109(6), C.R.S.2007, allows a prevailing party to recover court costs and reasonable attorney fees in a civil action under the bad check statute. In light of our determination that plaintiff may recover treble damages under the bad check statute, plaintiff is entitled to recover its costs and reasonable attorney fees, as well as its appellate fees and costs, and we remand for the trial court to make that determination.

The judgment is affirmed, and the case is remanded for the trial court to determine and award plaintiff its reasonable attorney fees and costs incurred on appeal.

Judge MÁRQUEZ and Judge DAILEY concur.