COLORADO COURT OF APPEALS 2017COA95

Court of Appeals No. 16CA1337
Montrose County District Court No. 16CV30022
Honorable J. Steven Patrick, Judge

Dan W. Hotsenpiller, District Attorney, Seventh Judicial District,

Plaintiff-Appellant,

v.

Honorable Bennet A. Morris, a Judge of the County Court for the County of
Montrose,

Defendant-Appellee.

JUDGMENT REVERSED AND CASE
REMANDED WITH DIRECTIONS

Division A
Opinion by CHIEF JUDGE LOEB
Plank* and Márquez*, JJ., concur

Announced July 13, 2017

Dan W. Hotsenpiller, District Attorney, Barbara J. Sanford, Assistant District
Attorney, Montrose, Colorado, for Plaintiff-Appellant

Cynthia H. Coffman, Attorney General, Grant T. Sullivan, Assistant Solicitor
General, Denver, Colorado, for Defendant-Appellee

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art.
VI, § 5(3), and § 24-51-1105, C.R.S. 2016.

¶ 1　In this C.R.C.P. 106(a)(4) action, the District Attorney of Montrose County, Dan W. Hotsenpiller (District Attorney), appeals the district court's order upholding the ruling of Montrose County Court Judge Bennet A. Morris (county court), which concluded that the affirmative defense of consent was available to John Hartsuff in his criminal case on the charge of violation of a civil protection order (CPO).

¶ 2　The sole issue on appeal is whether the affirmative defense of consent, as defined in the consent statute, section 18-1-505, C.R.S. 2016, is available to a defendant who is criminally charged with violating a protection order, pursuant to section 18-6-803.5, C.R.S. 2016.　As a matter of first impression, we conclude that the county court abused its discretion by ruling that Hartsuff could assert the affirmative defense of consent, because the court misinterpreted the law regarding CPOs and language in the consent statute that allows the defense when the alleged assent of the victim "precludes the infliction of the harm or evil sought to be prevented by the law defining the offense," § 18-1-505(1).　Accordingly, we reverse the district court's order upholding the county court's ruling and

remand with directions for the district court to remand the case to the county court with instructions to proceed with Hartsuff's trial and to preclude the affirmative defense of consent on the charge of violation of a protection order.

## I. Background and Procedural History

### A. Alleged Violation of a CPO

¶ 3 J.C. obtained a temporary CPO against her ex-boyfriend, Hartsuff. The county court made the CPO "permanent" in May 2015. § 13-14-106, C.R.S. 2016.

¶ 4 The CPO issued in this case was on JDF Form 399. JDF 399, Permanent Civil Protection Order Issued Pursuant to § 13-14-106, C.R.S. (revised Sept. 2013), https://perma.cc/CUR5-9HP8. The form order lists Hartsuff as the restrained person and J.C. as the protected person. The order states that the restrained person constitutes a credible threat to the life and health of the protected person and that sufficient cause exists for the issuance of the CPO. A warning then appears, in a box and in large print, stating as follows: "*This Protection Order DOES NOT EXPIRE and only the Court can change this Order.* A violation of a Protection Order is a crime and may be prosecuted . . . pursuant to § 18-6-803.5, C.R.S." (Here

and for all subsequent quotes to JDF 399, original bold emphasis has been changed to italics.)

¶ 5     The CPO declares that "[i]t is ordered that you, the Restrained Person, *shall have no contact of any kind* with the Protected Person[]" and explicitly states that there are no exceptions to contact. The CPO further orders Hartsuff to stay at least one hundred yards away from J.C.'s home and work.

¶ 6     The final page of the CPO informs the parties of "IMPORTANT INFORMATION ABOUT PROTECTION ORDERS." As relevant here, this page includes a notice to the protected person that he or she "cannot give the Restrained Person permission to change or ignore this Order in any way. *Only the Court can change this order.*" Similarly, the restrained person is notified that if he or she "violate[s] this Order thinking that the other party or anyone else has given you permission, *you are wrong*, and can be arrested and prosecuted. The terms of this Order cannot be changed by agreement of the parties. *Only the Court can change this Order.*"

¶ 7     In July 2015, J.C. called police and stated that Hartsuff was on her front porch[1] threatening her.  She told the dispatcher that there was a CPO in place prohibiting Hartsuff from contacting her.  Before police arrived, Hartsuff left the premises on foot.  In addition to reporting the contact at her home, J.C. showed the responding officer text messages and logs of phone calls from Hartsuff over the previous two days.  In the affidavit for Hartsuff's warrantless arrest, the responding officer noted that J.C. had texted Hartsuff several times, asking him to leave her alone, and that Hartsuff called J.C.'s phone while police were on the way to her home.  Dispatch confirmed the existence of the CPO, and Hartsuff was arrested at a nearby intersection by officers patrolling the area.

¶ 8     Hartsuff was charged with harassment and violation of a protection order, both as acts of domestic violence.

---

[1] The address listed for J.C.'s home in the CPO is the address to which police responded for the incident that gave rise to the charges here.

4

## B.    County Court Criminal Proceedings

¶ 9    In his preliminary notice of endorsements, Hartsuff raised the affirmative defense of consent.[2]  At a pretrial hearing, the prosecution objected to Hartsuff's endorsed consent defense as applied to the charge of violation of a protection order.  At the hearing, defense counsel argued that, under section 18-1-505, J.C.'s alleged assent[3] to contact precluded the infliction of the harm the violation of a protection order statute was attempting to prevent — namely, contact between the restrained person and the protected person.  Counsel argued that the purpose of the violation of a protection order statute was not to protect the court's order, but only to protect the protected person.  He also asserted that precluding the defense of consent would create an untenable situation where the protected person could approach the restrained

_____

[2] Neither the preliminary endorsement nor the transcript of the later pretrial conference lists any specific evidence of J.C.'s alleged consent.  The endorsement also does not state to which charge Hartsuff asserted the defense of consent.

[3] In this opinion, the term "consent" refers only to the statutory definition of the consent defense.  "Assent" refers to the alleged conduct of the victim that purportedly renders the consent defense applicable.  Here, Hartsuff alleged that J.C. assented to the contact with which he was charged under the violation of a protection order statute.

person and initiate contact, and the restrained person then could be charged with a violation of the protection order.

¶ 10 The prosecution responded that a protected person cannot consent to allow another person — even the restrained person — to violate a court order.

¶ 11 The county court ruled that the affirmative defense of consent was available to Hartsuff because J.C.'s alleged assent "preclude[d] the infliction of the harm or evil sought to be prevented" by the violation of the protection order statute — specifically, unwanted contact. § 18-1-505(1). In its written order, the court quoted the consent statute and then reasoned as follows:

> The [CPO] was put into place . . . at the request of the protected person – now the alleged victim in this case. That person did not desire contact or proximity with [Hartsuff]. The Court finds that the affirmative defense of consent of the alleged victim to contact or proximity with [Hartsuff], would preclude the infliction of the harm sought to be prevented by a protection order originally put in place at the request of the victim/protected person, at least in part, to prevent such contact or proximity.

Consequently, the court concluded that the affirmative defense of consent was available to Hartsuff and that the prosecution was,

6

therefore, required to disprove J.C.'s consent beyond a reasonable doubt in addition to proving the statutory elements of violation of a protection order.

### C. C.R.C.P. 106(a)(4) Review in the District Court

¶ 12 The District Attorney then sought judicial review of the county court's order in the district court pursuant to C.R.C.P. 106(a)(4).

¶ 13 On review, the district court framed the question as "whether or not the [county] court's determination to permit the affirmative defense of consent to the violation of a civil protection order at trial is an abuse of discretion." The district court reasoned that neither the consent statute nor the statute regarding the charged offense of violation of a protection order expressly prohibited consent as an affirmative defense. It concluded that the District Attorney had failed to show that the county court abused its discretion and, thus, remanded the case to the county court to proceed with trial.

¶ 14 The District Attorney now appeals the district court's order affirming the county court's decision to allow Hartsuff to assert the

affirmative defense of consent to the charge of violation of a protection order.[4]

## II. Standard of Review

¶ 15    Under C.R.C.P. 106(a)(4), our review is "limited to a determination of whether the [governmental] body or officer has exceeded its jurisdiction or abused its discretion, based on the evidence in the record before the defendant body or officer." C.R.C.P. 106(a)(4)(I).

¶ 16    A reviewing court may reverse the decision of a lower judicial body for an abuse of discretion if the reviewing court finds that the lower body acted "arbitrarily or capriciously, made a decision that is unsupported by the record, erroneously interpreted the law, or exceeded its authority." *Nixon v. City & Cty. of Denver*, 2014 COA 172, ¶ 12 (citing *Lawley v. Dep't of Higher Educ.*, 36 P.3d 1239, 1245 (Colo. 2001)).  In an appeal involving a C.R.C.P. 106 action, the appellate court sits in the same position as the district court in reviewing the county court's decision.  *Shupe v. Boulder Cty.*, 230 P.3d 1269, 1272 (Colo. App. 2010).  We are, therefore, limited to

---

[4] In this appeal, the Attorney General represents Judge Morris and defends the county court's order.

reviewing whether the county court abused its discretion in ruling that the consent defense was available to Hartsuff.  *Id.*; *see also Alpenhof, LLC v. City of Ouray*, 2013 COA 9, ¶ 9.

¶ 17     In addition, we review a governmental officer's interpretation of the law de novo.  *Treece, Alfrey, Musat & Bosworth, PC v. Dep't of Fin.*, 298 P.3d 993, 996 (Colo. App. 2011) (citing *Van Sickle v. Boyes*, 797 P.2d 1267, 1274 (Colo. 1990)).  Here, we are reviewing de novo a judicial body's interpretation and application of Colorado statutes and, thus, we do not owe the county court deference in our application of the ordinary rules of statutory construction.  *See Alpenhof, LLC*, ¶ 10.

¶ 18     Our primary task in interpreting a statute is to give effect to the General Assembly's intent by first examining the statute's plain language.  *E.g.*, *Stanley v. Dist. Attorney*, 2017 COA 33, ¶ 10.  "To discern the General Assembly's intent, we look to the plain language of the statute, and where that language is clear and unambiguous, we engage in no further statutory analysis."  *People v. Rice*, 2015 COA 168, ¶ 11.

¶ 19     If we determine that the relevant statute is unambiguous, we give effect to the statute's plain and ordinary meaning without

resorting to other rules of statutory construction. *See, e.g., St. Vrain Valley Sch. Dist. RE-1J v. A.R.L.*, 2014 CO 33, ¶ 11. If, however, the statutory language lends itself to alternative constructions and its intended scope is ambiguous or unclear, we then look to the statute's context, legislative history, prior law, the consequences of a given construction, and the goal of the statutory scheme. *Suncor Energy (USA), Inc. v. Aspen Petroleum Prods., Inc.*, 178 P.3d 1263, 1266 (Colo. App. 2007).

¶ 20    Statutes should not be read in isolation, but together with all other statutes relating to the same subject or having the same general purpose, to the end that a statute's intent may be ascertained and absurd consequences avoided. *Huddleston v. Bd. of Equalization*, 31 P.3d 155, 159 (Colo. 2001). "This is especially true where a statute intimates by its plain language an intent to incorporate other statutory provisions." *Id.*

¶ 21    If we determine that a statute is ambiguous, we may also consider legislative declarations in determining the General Assembly's intent. § 2-4-203(1)(g), C.R.S. 2016. Legislative declarations included with the statutory scheme at issue may be relevant in determining the intent of the General Assembly and the

10

problems it was attempting to address.  *See Lester v. Career Bldg.*

*Acad.*, 2014 COA 88, ¶¶ 25-27.  Indeed, "[o]ften the best guides to

legislative intent are the context in which the statutory provisions

appear and any accompanying statements of legislative policy, such

as a legislative declaration."  *A.R.L.*, ¶ 11.

¶ 22    Specific to this case, "[t]he question of whether consent can

constitute a defense to a crime is best analyzed in the context of

particular offenses and particular conduct."  Model Penal Code §

2.11 note 1 on General Principles (Am. Law Inst., Official Draft and

Revised Comments 1985) (hereinafter MPC).[5]

### III.    Relevant Statutes

¶ 23    This case hinges on the county court's interpretation of the

consent statute and the violation of a protection order statute,

---

[5] Colorado's consent statute is based largely on the Model Penal
Code.  Model Penal Code § 2.11 note 12 (Am. Law Inst., Official
Draft and Revised Comments 1985) (listing Colorado's section 18-1-
505, C.R.S. 2016, as one of the provisions similar to Model Penal
Code § 2.11) (hereinafter MPC).  Additionally, the MPC definition of
consent is located in the "General Principles of Liability" article,
similar to the Colorado statute's location in the "Provisions
Applicable to Offenses Generally" article.  § 18-1-505; MPC § 2.11.
Significantly, the language in section 18-1-505 regarding "precludes
the infliction of the harm or evil sought to be prevented" by the
criminal offense is identical to MPC section 2.11.  Thus, we refer to
the MPC and its commentary for guidance on the meaning of the
consent statute.

sections 18-1-505 and 18-6-803.5, respectively. In addition to these statutes, we must also consider the CPO statutes because the violation of a protection order statute specifically references and incorporates title 13, article 14 in the definition for "protection order," and Hartsuff's charge is based on a CPO issued pursuant to section 13-14-106. § 18-6-803.5(1.5)(a.5)(I)(A).

## A. The Consent Statute

¶ 24 Under section 18-1-505, the defense of consent of the victim is *not available* to any crime *unless* "the consent negatives an element of the offense or precludes the infliction of the harm or evil sought to be prevented by the law defining the offense." § 18-1-505(1). The statute also lists certain situations in which the victim's assent does not constitute a consent unless the criminal code or the law defining the offense specifically provides otherwise. § 18-1-505(3). These situations include, for example, where assent is given by a person whose consent is sought to be prevented by the law defining the offense. § 18-1-505(3)(c). The General Assembly has

characterized the defense of consent as an affirmative defense.[6]

§ 18-1-505(4).

¶ 25     Colorado case law interpreting the consent statute and its applicability is very sparse and limited in scope. All appellate Colorado cases regarding consent concern the language of the statute relating to negating an element of the offense or, in one case, lack of legal authority to consent, and almost all deal with consent in the context of sexual assault. *See, e.g., Oram v. People*, 255 P.3d 1032 (Colo. 2011) (stating consent negates elements of burglary, but instruction not warranted because party consenting to entry did not have authority to consent); *People v. Martinez*, 36 P.3d 154 (Colo. App. 2001) (finding that in sexual assault context, affirmative defense of consent instruction not warranted because elements of sexual assault only allow conviction if victim did not consent); *People v. Bush*, 948 P.2d 16 (Colo. App. 1997) (negating elements of theft); *People v. Williams*, 899 P.2d 306 (Colo. App.

---

[6] An affirmative defense admits the defendant's commission of the elements of the crime charged, but seeks to justify the act. *People v. Nelson*, 2014 COA 165, ¶ 48. Availability of an affirmative defense means that the defense becomes an element of the offense and the court must instruct the jury that the prosecution has the burden of disproving the affirmative defense beyond a reasonable doubt. *Id.* at ¶ 49.

1995) (negating an element of offense in sexual assault). The parties have not cited any Colorado case, and we have found none, concerning the applicability of the consent defense when the alleged assent "precludes the infliction of the harm or evil sought to be prevented by the law defining the offense."[7] § 18-1-505(1).

¶ 26 For the reasons below, we conclude that the clause at issue in this case ("precludes the infliction of the harm or evil sought to be prevented by the law defining the offense") is ambiguous because it is unclear and subject to alternative constructions. The Attorney General argues that the phrase means only the harm to the alleged victim, here, J.C. As a result, the Attorney General contends that the county court was correct in defining the harm or evil sought to be prevented by the violation of a protection order statute as simply contact between the protected and restrained persons. On the other hand, the District Attorney asserts that the crime at issue here is designed to enforce a court order and that, in determining

---

[7] The model jury instruction and its comments regarding consent are equally silent on the meaning of this language. COLJI-Crim. H:03 (2016). The comments to the instruction address only the situation where assent of the victim negates an element of the offense charged; the language of the instruction seems to leave defining the harm sought to be prevented by the law defining the offense to the parties and the court in drafting the instructions. *Id.*

14

the harm sought to be prevented, we must both consider the context of the violation of a protection order statute and the General Assembly's intent with regard to crimes of domestic violence. According to the District Attorney, then, the harm or evil sought to be prevented by the violation of a protection order statute is broader than simply contact between the protected and restrained persons and includes preserving the integrity of a court order and preventing domestic violence.

¶ 27    In our view, the language at issue thus lends itself to alternative constructions, and the intended scope of the consent statute is unclear with respect to the "harm or evil" language. *Suncor Energy (USA), Inc.*, 178 P.3d at 1266. Indeed, the consent statute explicitly requires us to consider other statutes in determining the potential applicability of the defense. *Huddleston*, 31 P.3d at 159.

¶ 28    Thus, we disagree with the county court to the extent it determined that the phrase "precludes the infliction of the harm or evil sought to be prevented by the law defining the offense" is unambiguous. Because we determine that the phrase is ambiguous, *id.*; *Suncor Energy (USA), Inc.*, 178 P.3d at 1266, we

15

must look to the legislative history, consequences of a given construction, and goals of the relevant statutes. *Suncor Energy (USA), Inc.*, 178 P.3d at 1266. We must also consider the entire statutory scheme relating to the offense of violation of a protection order to give effect and meaning to all its parts. *Wolford v. Pinnacol Assurance*, 107 P.3d 947, 951 (Colo. 2005).

### B. Criminal Statutes Regarding Violation of a Protection Order

¶ 29    A person commits the crime of violation of a protection order

> if, after the person has been personally served with a protection order that identifies the person as a restrained person . . . , the person:
>
> (a) Contacts, harasses, injures, intimidates, molests, threatens, or touches the protected person or protected property . . . identified in the protection order or enters or remains on premises or comes within a specified distance of the protected person, protected property . . . or premises . . . .

§ 18-6-803.5(1)(a).

¶ 30    The definition of "protection order" is central to this offense and includes all protection orders issued pursuant to article 14 of title 13 of the Colorado Revised Statutes, the statutes governing CPOs. § 18-6-803.5(1.5)(a.5)(I)(A). The statute also includes

16

protection orders issued in domestic relations and criminal cases.[8]

§ 18-6-803.5(1.5)(a.5)(I)(A), (B).

¶ 31    Putting the offense into its statutory context, violation of a

protection order appears in article 6 of the Criminal Code, "Offenses

Involving the Family Relations," specifically, in part 8, titled

"Domestic Violence."

¶ 32    The Attorney General asserts that, because the violation of a

protection order statute does not specifically preclude the

affirmative defense of consent, the defense should apply since the

consent statute is "applicable to offenses generally." *See* § 18-1-505

(article 1 of the Criminal Code is titled "Provisions Applicable to

Offenses Generally"). This reasoning does not comport with the

plain language of the consent statute or the structure of the

Criminal Code in general.

---

[8] We reject the Attorney General's argument that, because the order here was a CPO and not a mandatory protection order issued in a criminal case, assertion of the consent defense is somehow more appropriate because the CPO was sought by a private individual as opposed to the government. The offense statute makes no such distinction. The only difference between a protection order issued in a criminal proceeding and a CPO is that violation of a criminal protection order is a class 1 misdemeanor as opposed to a class 2 misdemeanor. § 18-6-803.5(2)(a), C.R.S. 2016. This difference is irrelevant to the question whether the affirmative defense of consent is available for the crime of violation of a protection order.

17

¶ 33    The premise of the consent statute is that consent is *not* an

available defense; the only exceptions are when consent would

negate an element or when consent would preclude the infliction of

the harm or evil sought to be prevented by the law defining the

criminal offense.  § 18-1-505(1); *Williams*, 899 P.2d at 309 ("[T]he

statutory definition of consent expresses the clear legislative

decision to make the defense inapplicable unless the consent either

'negatives' an element of the charged offense or precludes the

infliction of the harm sought to be prevented by the law defining the

offense.").  Thus, the starting point for Colorado criminal offenses is

that consent is not available as a defense.[9]

¶ 34    Additionally, the structure and language of statutes defining

criminal offenses belie the Attorney General's argument.  For

offenses where consent of the victim *is* a defense, such as sexual

assault, the statute does not explicitly state consent is a defense.

§ 18-3-402, C.R.S. 2016.  Instead, the statutory elements of those

crimes necessarily "negate[] the existence of the victim's

consent. . . .  The[] acts of the defendant cause the victim to be

---

[9] This is a notable difference between the Colorado statute and MPC
§ 2.11.

unable to consent." *Dunton v. People*, 898 P.2d 571, 573 (Colo. 1995) (regarding § 18-3-402). Similarly, the homicide and sex assault on a child statutes, the quintessential offenses where assent of the victim *is not* a defense, do not specifically preclude consent as a defense. §§ 18-3-101 to 18-3-107, 18-3-405, C.R.S. 2016. In short, Colorado criminal statutes do not routinely include or exclude available defenses, and the omission here of a reference to consent is irrelevant.

¶ 35　What is relevant to determining whether consent is an available defense is the context of the offense charged and the particular conduct prohibited. MPC § 2.11 note 1 on General Principles. Thus, we next consider the statutory framework regarding CPOs.

## C.　Statutes on CPOs

¶ 36　The type of protection order Hartsuff is accused of violating is a CPO governed by title 13, article 14 of the Colorado Revised Statutes. § 18-6-803.5(1.5)(a.5)(I)(A). Title 13 governs the administration, organization, and procedures of Colorado courts. §§ 13-1-101 to 13-92-104, C.R.S. 2016 (titled "Courts and Court

Procedure"). Article 14 outlines the procedures for obtaining a CPO. §§ 13-14-100.2 to 13-14-110, C.R.S. 2016.

¶ 37 The county court issued a permanent CPO restraining Hartsuff pursuant to section 13-14-106. Once a court determines that the restrained person "has committed acts constituting grounds for issuance of a [CPO] and that unless restrained will continue to commit such acts or acts designed to intimidate or retaliate against the protected person, the judge or magistrate shall" enter a permanent CPO. § 13-14-106(1)(a). The issuing court must inform the restrained person that violation of the CPO constitutes a criminal offense pursuant to section 18-6-803.5 or contempt of court. *Id.*

¶ 38 The court issuing the CPO "retains jurisdiction to enforce, modify, or dismiss" the CPO. § 13-14-108(4), C.R.S. 2016. A protected person can apply to the court at any time for modification or dismissal of a CPO. § 13-14-108(2)(a). In addition, the restrained person may also apply for modification or dismissal under limited circumstances. § 13-14-108(2)(b). The court is required to hear any motion for modification filed under subsection (2), and it must consider numerous factors in deciding whether to

modify or dismiss the CPO.  § 13-14-108(5), (6).  The sole means prescribed in the statute for modifying or dismissing a CPO are through the court.

### IV.  A Protected Person's Alleged Assent does not Constitute Consent Under Section 18-1-505

¶ 39    The parties agree that the issue whether consent can be an affirmative defense to violation of a protection order is an issue of first impression in Colorado.  Moreover, as previously mentioned, Colorado appellate courts have considered the consent defense in very few contexts, and there is little case law interpreting the language of the consent statute.  But, because Colorado's consent statute is based on MPC section 2.11, the MPC commentaries and annotations are instructive.  We also find persuasive cases from other states that have considered whether the affirmative defense of consent may be asserted in the context of a criminal charge for violation of a protection order.

¶ 40    For the reasons below, we conclude that the county court erred as a matter of law in allowing the affirmative defense of consent for the crime of violation of a protection order.

21

## A. A CPO is an Order of the Court

¶ 41    We first conclude that, because the CPO is an order of the court and not an order issued by the protected person, the protected person's alleged assent to contact cannot, as a matter of law, constitute a restrained party's defense to the crime for violation of a protection order.

¶ 42    In Colorado, a court has the power to "compel obedience to its lawful . . . orders." § 13-1-114(1)(c), C.R.S. 2016.  Court orders are crucial to the administration of justice.  Indeed, "[t]he orderly and expeditious administration of justice by the courts requires that 'an order issued by a court with jurisdiction over the subject matter and person *must be obeyed by the parties until it is reversed by orderly and proper proceedings.'" Maness v. Meyers*, 419 U.S. 449, 459 (1975) (emphasis added) (quoting *United States v. United Mine Workers*, 330 U.S. 258, 293 (1947)) (in the context of contempt proceedings).  The CPO at issue here specifically stated that the court had jurisdiction over the parties and the subject matter.  Thus, it must be obeyed by Hartsuff until it expired or was changed "by orderly and proper proceedings." *Id.*

¶ 43    As to expiration, the CPO here is a "permanent" CPO issued pursuant to section 13-14-106.  The word "permanent" is not defined in section 13-14-106 or in the definitions section of article 14, section 13-14-101, C.R.S. 2016; nor does the statute state a duration for the permanent protection order.  However, the CPO here explicitly emphasized that the order did not expire.  Moreover, "where, as here, the statute does not define a term, the word at issue is a term of common usage, and people of ordinary intelligence need not guess at its meaning, we may refer to dictionary definitions in determining the plain and ordinary meaning." *Roalstad v. City of Lafayette*, 2015 COA 146, ¶ 34 (quoting *Mendoza v. Pioneer Gen. Ins. Co.*, 2014 COA 29, ¶ 24).  Giving the word "permanent" its plain and ordinary meaning, this order was perpetual and intended to be continuing or enduring without change.  Webster's Third New International Dictionary of the English Language, Unabridged 1683 (1993).  Thus, this CPO was perpetual and remained in effect until the court modified or dismissed it.

¶ 44    Section 13-14-108 lays out the only procedures for modifying or dismissing a CPO.  A protected person may petition the court to

modify or dismiss the order at any time; a restrained person can file a motion after the protection order has been in place for two years. § 13-14-108(2)(a), (b).  Importantly, no statutory mechanism exists for the protected person or the restrained person to modify or dismiss the order without the court's approval or consideration. Indeed, the issuing court retains jurisdiction to enforce, modify, or dismiss a CPO, and it is required to consider a long list of factors when determining whether to modify or dismiss the CPO.  § 13-14-108(4)-(6).  Additionally, the CPO itself warned both Hartsuff and J.C. multiple times in emphasized font that only the court could modify or dismiss the order and the parties could not agree to change the terms of the order.

¶ 45    We emphasize these avenues for modification because Hartsuff's defense, that J.C. consented to the contact and, thus, he did not violate the order, would effectively modify — without court approval — that part of the CPO that restrains Hartsuff from having *any* contact *whatsoever* with J.C., *no exceptions.*

¶ 46    In our view, there are strong indications that a CPO is properly characterized as an order and function of the court and not an order issued by the victim — the importance to the administration

of justice of enforcing orders of the court, the very limited and specific mechanisms for modifying or dismissing a permanent CPO, the explicit warnings to Hartsuff and J.C. that they could not agree to change the order without court approval, and the General Assembly's placement of the statutes governing CPOs in the court procedures title.

¶ 47    This reasoning is supported by several out-of-state cases.  For example, in *State v. Kidder*, 843 A.2d 312 (N.H. 2004), the New Hampshire Supreme Court stated:

> [W]e emphasize that protective orders are orders of the court, not orders of the victim, and neither the defendant, the victim, nor a representative of either party has the authority to approve exceptions to the order.
>
> If the defendant has a legitimate reason to contact the victim, he is not without remedy. He can petition the court for an exception to or modification of the restraining order.

*Id.* at 317 (citations omitted); *see also In re Shirley*, 28 A.3d 506, 511 (D.C. 2011) (protective order is an order of the court, not the victim); *People v. Townsend*, 538 N.E.2d 1297, 1299 (Ill. App. Ct. 1989) (same).

¶ 48     A protected person simply cannot "consent," under section 18-1-505, to another person's violation of a court order.  Under the plain language of the consent statute, assent by the victim does not constitute consent if the assent is "given by a person whose consent is sought to be prevented by the law defining the offense."  § 18-1-505(3)(c).  Here, the CPO statutes, particularly the provisions regarding modification and dismissal, preclude the protected person from modifying or dismissing the CPO without court involvement, and the CPO itself explicitly says that the parties cannot agree to change the order.  *See In re Shirley*, 28 A.3d at 511 (considering similar CPO language to conclude that purported consent of the protected person for contact with the restrained person could not modify the CPO to excuse the alleged contact).

¶ 49     Further, the Model Penal Code notes that subsection (3)(c) of its consent section is intended to prevent "improvident consent" that is "the very objective sought to be prevented by the law defining the offense."  MPC § 2.11 note 3 on Ineffective Consent*; see also State v. Cardus*, 949 P.2d 1047, 1056 (Haw. Ct. App. 1997) (concluding that an inmate cannot consent to sexual penetration by a prison guard, in part, because the statute criminalizing sexual

penetration between inmates and guards sought to prevent such consent by the inmate).  Here, the alleged assent to contact by a protected person who allegedly experienced domestic abuse at the hands of the restrained person is a prime example of "improvident consent" that the CPO statutes seek to prevent.  *See also* § 13-14-100.2(1), (2) (reflecting the General Assembly's goal to reduce domestic abuse by effective provisions in protective orders).

### B.    The County Court Misinterpreted the Consent Statute Phrase "Harm or Evil Sought to be Prevented" in the Context of the Violation of a Protection Order Statute

¶ 50    The county court concluded that J.C.'s alleged assent constituted consent under section 18-1-505 because it precluded the infliction of the harm or evil sought to be prevented by the violation of a protection order statute — "contact or proximity" with the restrained person.  As we have previously concluded, the county court apparently did not recognize the inherent ambiguity of the relevant language in section 18-1-505(1), in the context of a criminal violation of a protection order.  Accordingly, our analysis below seeks to resolve that ambiguity and leads us to conclude that, in this context, the affirmative defense of consent is not

27

applicable to a charge of violation of a protection order under section 18-6-803.5(1)(a).

¶ 51    In our analysis, we are particularly concerned with the "isolation of the societal objectives of the offense" so that we may determine whether J.C.'s alleged assent to contact can constitute consent as contemplated by section 18-1-505. MPC § 2.11 note 1 on General Principles. Because, in our view, the county court too narrowly defined the "harm or evil sought to be prevented" by the violation of a protection order, we conclude the court abused its discretion in allowing the consent defense. Specifically, the county court should have considered the violation of a protection order statute in the context of the harm that the General Assembly intended to prevent in the statutes defining and governing CPOs.

¶ 52    The violation of a protection order statute criminalizes *any* contact a restrained party has with the protected person identified in a protection order. § 18-6-803.5(1)(a). The statute does not mention consent of the protected person or preventing harm to the protected person; neither consent nor harm to the protected person is an element of the crime. Therefore, as the county court noted at the preliminary hearing, consent cannot be a defense to violation of

a protection order by way of negating an element of the crime charged. *See Dixon v. State*, 869 N.E.2d 516, 520 (Ind. Ct. App. 2007) (considering MPC section 2.11 and concluding that the protected person's alleged assent to contact does not negate an element of invasion of privacy when that crime does not have an element of consent; defendant was charged with invasion of privacy by "knowingly or intentionally violating a protective order").

¶ 53    The statute provides several definitions of the term "protection order," including any order issued pursuant to title 13, article 14 of the C.R.S., as is the case here. We, therefore, must consider title 13, article 14 and its "societal objectives" in our analysis. *Huddleston*, 31 P.3d at 159; MPC § 2.11 note 1 on General Principles.

¶ 54    Article 14 begins with a lengthy and specific legislative declaration. § 13-14-100.2. The first part of the declaration is general to all protection orders, criminal and civil, and states that issuing and *enforcing* protection orders are of "paramount importance" in Colorado because they "promote safety, reduce violence and other types of abuse, and prevent serious harm and death." § 13-14-100.2(1). Notably, these goals are not limited to

the protected person, but address general harms sought to be prevented. These are harms to society. Indeed, "reduc[ing] violence and other types of abuse" is a "societal objective," not a goal specific to a single person. *Id.*; MPC § 2.11 note 1 on General Principles.

¶ 55 The declaration also addresses domestic abuse specifically and, of relevance here, reflects the General Assembly's acknowledgment that domestic abuse can create a situation where the abused person is more likely to return to an abuser and that protection orders may still be appropriate even when reconciliation occurs. § 13-14-100.2(2).

¶ 56 Given these legislative declarations regarding the importance and purpose of enforcing CPOs, we conclude that the harm or evil sought to be prevented by a CPO, including enforcing it through criminal charges for a violation of such an order, is not mere contact with the protected person as the county court concluded, but preventing the societal harms of violence, domestic abuse, and serious harm or death. Our conclusion is supported not only by the legislative declaration in article 14, but also by the commentary to the MPC that consent "is not a defense in . . . situations where the law has objectives that go beyond the interests that may be

30

asserted by an identifiable victim." Model Penal Code § 2.11 note 1 on General Principles. Here, the objectives of a CPO go beyond the interests of protecting the named protected person and, as indicated in the legislative declaration, include preventing domestic abuse and eliminating circumstances that make it more likely that an abused victim will return to his or her abuser. § 13-14-100.2(1), (2).

¶ 57     Furthermore, a protected person's alleged assent to contact with the restrained person does not prevent the infliction of violence, abuse, or death upon the protected person, nor does it prevent violation of a court order. Other states have also concluded that alleged assent to contact by a protected person does not preclude the harm sought to be prevented by the issuance and enforcement of protection orders. *See In re Shirley*, 28 A.3d at 511 (noting that the legislative body recognized that the public has an interest in preventing the intrafamily violence that CPOs are intended to prevent and consent of a protected person to contact does not prevent intrafamily violence); *Dixon*, 869 N.E.2d at 520 (The court considered the MPC consent section and concluded the protected person's assent does not "preclude the infliction of

violence the statute seeks to prevent. Specifically, [the protected person's] alleged consent does not prevent violence nor does it preclude the violation of a court order.").

¶ 58    Indeed, as noted, the legislative declarations concerning CPOs in the context of domestic abuse indicate the General Assembly's intent that CPOs may continue to be necessary even when the parties choose to reconcile. § 13-14-100.2(2). Nothing in the language of the CPO statute or the violation of a protection order statute, both of which seek to prevent domestic violence, indicates the General Assembly's intent to provide an affirmative defense to a restrained person who violates a CPO because the protected person later allegedly assents to contact. *See State v. Branson*, 167 P.3d 370, 373 (Kan. Ct. App. 2007) (analyzing the domestic violence context of the crime of violation of a protective order to determine the legislature's intent that the crime is one against society, and to conclude that the defense of consent is not available); *see also State v. Dejarlais*, 969 P.2d 90, 92-93 (Wash. 1998) (holding that the purpose of the domestic violence statutes ruled out a consent defense to a charge of violating a domestic violence protection order).

¶ 59 It is telling that we have found *no* cases that conclude consent of the protected person is an available affirmative defense to the offense of violation of a protection order. The out-of-state cases the Attorney General cites in support of its arguments on appeal are inapposite. In *Mohamed v. Mohamed*, 557 A.2d 696, 697-98 (N.J. Super. Ct. App. Div. 1989), the civil court considered the validity of a custody provision in a protective order after the parties had reconciled; the court gave absolutely no consideration to the affirmative defense of consent because the case was not criminal in nature. Also, here, unlike in *Mohamed*, there are no children involved, there is no custody provision in the CPO, and the parties were never married or going through a reconciliation. Further, unlike the defendant in *Mohamed*, Hartsuff does not question the validity of the CPO. *Id.* at 698. The case is simply inapplicable.

¶ 60 In a second New Jersey case cited by the Attorney General, the court considered whether an alleged reconciliation prevented a temporary protective order from becoming permanent. *Torres v. Lancellotti*, 607 A.2d 1375, 1376 (N.J. Super. Ct. Ch. Div. 1992). This case, again, did not consider the affirmative defense of consent

— the context there was a civil proceeding rather than a criminal trial.[10]  *Id.*

¶ 61     Nor does our conclusion mean that a protected person's alleged assent to contact is wholly irrelevant, *In re Shirley*, 28 A.3d at 512-13, or that a protected person can, with impunity, approach the restrained person, initiate contact, and then later allege to the police that the restrained person violated the protection order.  We recognize that evidence of assent can, potentially, be relevant to show that the restrained person did not have the necessary mens rea for violation of a protection order, or that "contact," as that term is broadly defined, did not occur.  However, contrary to the Attorney General's argument, this is not the same as asserting consent as an affirmative defense.  When consent is an affirmative defense, the prosecution is required to disprove that defense beyond a reasonable doubt in addition to proving the elements of the crime of violation of a protection order.  *People v. Nelson*, 2014 COA 165,

---

[10] Interestingly, the *Torres* court held that revisions to the state's Domestic Violence Prevention Act required that "no [protection] order should be vacated upon a reconciliation or mutual violation without an analysis of the necessity for continued protection and restraints."  *Torres v. Lancellotti*, 607 A.2d 1375, 1377 (N.J. Super. Ct. Ch. Div. 1992).  If anything, this case supports our analysis and conclusion here.

¶ 49.  When a defendant argues that assent by the protected person shows that the prosecution did not prove all the elements of a crime, it is a traverse defense and the prosecution does not need to prove an additional element and the defendant is not entitled to a consent defense instruction.  *See id.* at ¶¶ 49, 52.

¶ 62    Further, we are not persuaded by the Attorney General's concerns that protected persons may unfairly invite contact with a restrained person and then use that contact to claim that the restrained person violated the protection order.  A defendant charged with violation of a protection order must knowingly contact a protected person in a way that violates the terms of a protection order.  *People v. Coleby*, 34 P.3d 422, 424 (Colo. 2001) (stating that the mens rea of knowingly applies to the conduct prong of the violation of a protection order statute).  In Colorado, the mens rea of "knowingly" is synonymous with "willfully," the mens rea applicable to the crimes charged in *Shirley* and *Dixon.*  With respect to conduct, a defendant acts knowingly or willfully when he or she is aware that his or her conduct is of the nature prohibited by the statute or is aware that the conduct is practically certain to cause the result.  § 18-1-501(6), C.R.S. 2016.  To constitute a violation of

35

a "no contact" provision of a protection order, "the defendant's conduct must involve physical touching or some element of direct or indirect communication, or attempted communication, with the victim. Consequently, *incidental contact that occurs unintentionally and is unavoidable* is not sufficient, by itself, to establish a violation." *People v. Serra*, 2015 COA 130, ¶ 34 (emphasis added). Thus, where the *only* contact alleged is when the protected person later decides to report contact that he or she initiated, evidence of such contact could arguably be "incidental contact that occurs unintentionally" or show that the defendant did not have the requisite mens rea because he or she was not aware that his or her conduct was of the type prohibited by statute. *Id.*; *see* § 18-1-501(6). In other words, "if the evidence showed that the [protected person] approached the [restrained person] without [the restrained person's] encouragement or consent . . . , the court might be unable to find that the respondent willfully violated the CPO (and, indeed, the government might hesitate to prosecute . . . )." *Shirley*, 28 A.3d at 512 (footnote omitted).

## V.    Conclusion

The district court's order is reversed, and the case is remanded with directions to remand to the county court for further proceedings and with instructions to preclude Hartsuff from asserting consent as an affirmative defense to the charge of violation of a protection order.

JUDGE PLANK and JUDGE MÁRQUEZ concur.