**P–W INVESTMENTS, INC., an Illinois Corporation, and Percy Wilson Mortgage and Finance Corporation, a Delaware Corporation, Plaintiffs-Appellants,**

v.

**CITY OF WESTMINSTER, a Municipal Corporation of Colorado, and City Council of the City of Westminster, Colorado, Defendants-Appellees and Cross-Appellants.**

No. 81SA195.

Supreme Court of Colorado,
En Banc.

Dec. 20, 1982.

Barnett & Beigel, Ltd., Harvey J. Barnett, Chicago, Ill., Hall & Evans, Thomas R. Bromberg, Arthur R. Karstaedt III, Denver, for plaintiffs-appellants.

Stitt, Wittenbrink & Nieman, James R. Stitt, Westminster, Eric Damian Kelly, Pueblo, for defendants-appellees and cross-appellants.

QUINN, Justice.

The appellant P.W. Investments (P.W.I.), with financing provided by appellant Percy Wilson Mortgage and Finance Company (Wilson), owns land involved in a two-phased real estate development called Rancho Pecos. Phase One of the development resulted in the construction of apartment buildings and that part of the development has since been sold by P.W.I. Phase Two of the development, which underlies this controversy, consists of real estate to be used for the future construction of additional apartment buildings and a number of water and sewer taps that have been installed and paid for but are not presently being utilized. P.W.I. and Wilson filed two lawsuits against the City of Westminster and its City Council (collectively referred to as Westminster) for declaratory and injunctive relief and for relief in the nature of prohibition and mandamus under C.R.C.P. 106(a)(4). The issues in both lawsuits centered on Westminster Ordinance No. 1031, enacted in 1977, which restricted the issuance of building permits due to limited water and sewer capacity. The Adams County District Court denied relief to P.W.I. and Wilson. Finding no error, we affirm the judgment.[1]

I.

In 1972 Sabra Enterprises, Inc. (Sabra) was the owner of certain undeveloped lands within the Westminster city limits. Sabra, with financing from Wilson, planned to build an apartment complex to be known as Rancho Pecos. On August 28, 1972, Sabra and Westminster entered into an Official Development Plan which was duly recorded

1. This appeal was transferred to this court from the court of appeals because of a constitutional challenge to the Westminster ordinance.

Sections 13–4–102(1)(b) and 13–4–110(1)(a), C.R.S.1973.

in the office of the Adams County Clerk and Recorder. The Plan provided for the construction of a total of 433 apartment units. Phase One of the Plan was to begin in the late fall of 1972 and to be completed within sixteen months. Phase Two was then to be commenced and completed within fourteen months. Sabra and Westminster also entered into a Subdivision Agreement which provided for the completion of the entire development within 730 days. On December 29, 1972, Sabra purchased sufficient water and sewer tap permits from Westminster to serve both phases of the development at a cost of $61,585.

Construction was commenced on schedule, but prior to completion Sabra defaulted on its obligation to Wilson. On November 1, 1974, Sabra assigned all its interest in the development, including the water and sewer tap permits, to P.W.I., a subsidiary of Wilson. P.W.I. expended approximately $400,000, advanced to it by Wilson, to complete Phase One of the development. Although P.W.I. installed preliminary public improvements on Phase Two,[2] a drop in demand for apartments and the advent of a nationwide real estate recession caused a cessation of further development.

During this period Westminster officials wrote two letters dealing with the availability of water and sewer service for Rancho Pecos. On August 2, 1973, James C. Black, the Westminster city engineer, wrote a letter to Sabra to serve "as verification as to the availability of water and sewer service for Rancho Pecos I Subdivision, Westminster, Colorado." On December 5, 1975, Steve Garman, Westminster city manager, wrote a letter in response to P.W.I.'s inquiry about the status of the water and sewer tap permits for Phase Two of construction. This letter warned that although water and sewer service was then available, there was "a finite limit on the number of users the City can ultimately serve with its water supply" and that, therefore, Westminster would not be able to "issue an open-ended commitment."[3]

As Westminster's 1975 letter implied, during the 1970s the city underwent a period of rapid growth in new housing developments. In 1974 the city adopted ordinances imposing new fees to be paid prior to the issuance of building permits. Ordinance No. 826 imposed a "park development fee" on developers, which was to be in addition to "any land contribution requirement."[4] In addition, Ordinance No. 828 imposed a new utility "system development charge" which was assessed independently of the water and sewer tap permit fees.[5] Even

2. The improvements made on Phase Two included utility installations, road extensions, curbs, gutters, drains, sidewalks and land grading, at a total cost of approximately $300,000.

3. This letter also advised P.W.I. that it would be subject to the newly enacted park and service development fees, and that the Official Development Plan was no longer viable due to P.W.I.'s failure to meet the completion dates set forth therein.

4. Under Westminster, Colo., Ord. No. 826 (1974), the stated policy of the city with respect to the development and construction of park and recreational facilities was that "newly developing areas be required to provide such facilities at the expense of the developer sufficient to serve the projected population of the development." The ordinance provided, in pertinent part, as follows:

"From and after May 1, 1974, every person, firm or corporation applying for a building permit for the original construction of any dwelling unit shall be required to pay, at the time of submitting the application for building permit, a park development fee based upon the number of dwelling units to be constructed as follows:

| | |
|---|---|
| Single family detached | $ 175.00 per unit |
| Single family attached or a mobile home | 130.00 per unit |
| Multiple family | 85.00 per unit |

"Such fee shall be used only for development of park and recreation facilities and services."

5. Section 8–8–16 of Westminster, Colo., Ord. No. 828 (1974), provided as follows: "The applicant shall pay, when applying for a building permit, in addition to any other fees which may be required by this Code, for the original construction of any dwelling unit, a system development charge, tabulated as hereinafter set forth. . . .

with these new fees, however, Westminster officials became worried that the city's rapid growth might outpace its capacity to provide water and sewer services. A study conducted in 1977 confirmed these concerns. While the city had extended some type of preliminary approval during the preceding seven years for the development of a potential 21,000 additional dwelling units, it would only have the capacity over the next two years to provide water and sewer service to an additional 2,900 units.

In response to this alarming situation, Westminster enacted in 1977 Ordinance No. 1031 which established a growth management plan and limited the issuance of building permits in accordance with the availability of water and sewer service. The ordinance provided that the majority of available permits would be awarded to active developers, although some permits were to be set aside for new and inactive developers.[6] The ordinance also created a special exemption from the established allocation procedure for the issuance of building permits based upon "Water Service Obligations" for which "valid consideration [had] been received by the City" prior to the effective date of the ordinance.[7] In addition, the ordinance provided that building permits would expire if they remained unused over a specified period of time.

In 1977 P.W.I. located a buyer for the second phase of construction at Rancho Pecos, but the sale was contingent upon water and sewer service availability. When Westminster refused to provide such assurances, P.W.I., on March 10, 1978, made a formal application to the city to be exempted from the growth management program, arguing that its prepaid and installed water and sewer taps constituted "Water Service Obligations" within the meaning of the ordinance.[8] P.W.I., along with Wilson, also filed suit in the Adams County District Court for declaratory and injunctive relief on various theories including, as pertinent here: Westminster Ordinance No. 1031 constituted retrospective legislation in violation of Article II, Section 11 of the Colorado Constitution; Westminster was equitably estopped from denying the availability of water and sewer service for Rancho Pecos; and P.W.I. and Wilson were exempted from certain building fees because they paid for the water and sewer tap permits before the fees were enacted. On April 12, 1978, a hearing was held on P.W.I. and Wilson's motion for a preliminary injunction. The court denied the injunction, noting that Westminster had not yet made a determination of P.W.I.'s application for a "Water Service Obligation" exemption. This determination was finally made on August 13, 1979, when the application was denied by the Westminster City Council.[9] P.W.I. and Wilson then filed the second suit seeking review of the denial, pursuant to C.R.C.P. 106(a)(4).

---

For each dwelling unit in excess of one (1) dwelling unit served by the same tap $185.00 per dwelling unit

For each mobile home space in excess of one (1) mobile home space served by the same tap $455.00 per mobile home space"

6. In addition to setting forth procedures for the issuance of building permits for active and inactive developers, Ordinance No. 1031 also established procedures for the issuance of permits for individual permit applicants, government sponsored housing, and nonresidential users.

7. Section 12–3–16 of Westminster, Colo., Ord. No. 1031 (1977), provided as follows:
"Should City Council determine that a Water Service Obligation exists for which

valid consideration has been received by the City prior to the effective date of this ordinance, building permits may be issued separate from the tap allocation provisions of this ordinance and shall not be a part of the formal allocation procedure; providing that the City Manager or his designee reports that the number of dwelling units allowed annually for such project will not create a burden on the water utility system to the extent that it jeopardizes the Allocation Program provided for herein."

8. P.W.I. did not apply for a building permit under Ordinance No. 1031 for construction of Phase Two of the Rancho Pecos development.

9. The denial was based upon the recommendation of the City Manager to City Council. According to the Official Development Plan, Phase Two of Rancho Pecos should have been

The two actions were consolidated and tried to the court in July 1980. The trial court ruled that since the water and sewer tap permits did not "constitute an open-ended undertaking by the City to provide [Rancho Pecos] with water and sewer services," Westminster Ordinance No. 1031 did not affect any rights gained from acquisition of the tap permits and therefore did not constitute retrospective legislation. Nor, in the trial court's view, was the city estopped from denying the availability of water and sewer service to P.W.I. Finding that the city in no way led P.W.I. to believe that "utility services to the taps in place on [Phase Two] would be available indefinitely," the court concluded that P.W.I. did not

completed about June 1975, but no significant work had been done on the development for several years. No change in the development schedule had ever been submitted by Sabra or P.W.I. to the city. As of August 1979, there was no excess water supply available to serve Phase Two of the development and, thus, according to the City Manager, it could not be stated that Phase Two "would not create a burden on the water utility system which in turn would not jeopardize the existing Allocation Program for residential entitlements." *See* Westminster, Colo., Ord. No. 1031, § 12–3–16, *supra* note 7. Finally, creating a Water Service Obligation exemption for P.W.I., according to the City Manager, would "generate yet additional sewage that would further impact upon the City's ability to meet Federal and State stream standards."

**10.** There are two rulings of the trial court which we do not further address. The trial court agreed with P.W.I. and Wilson that the 'Water Service Obligation' section of Ordinance No. 1031 was unconstitutionally vague because, as stated by the trial court, there were "no standards to guide its enforcement" and "[t]he City Council is granted practically unfettered discretion thereunder to decide [what] a 'Water Service Obligation' ... is ...." The remaining sections of the ordinance were upheld. Although Westminster cross-appealed this ruling, it has conceded in its brief that the ordinance expired by its own terms during the course of this litigation and the vagueness issue is therefore moot. We accordingly do not address this argument.

The other ruling that we do not specifically address relates to P.W.I.'s failure to apply for building permits under the "Special Base Allocation" section of Ordinance No. 1031, which

rely on any such belief and that, even if it had so relied, such reliance would have been unreasonable. The court also rejected P.W.I.'s claim for exemption from the park and system development fees. Finally, the court recognized Westminster's stipulation that P.W.I. would not be required to pay increases in tap fees that had been enacted since the Rancho Pecos taps were purchased in 1972, but held that the stipulation would only be binding should P.W.I. elect to apply for building permits "within a reasonable time." P.W.I. and Wilson appeal these conclusions and we will address each in turn.[10]

## II.

P.W.I. and Wilson first claim that Westminster Ordinance No. 1031 is retrospective

set aside a limited number of permits for new and inactive builders. P.W.I. and Wilson argue that Westminster is estopped from raising their failure to apply for a "Special Base Allocation" permit because, P.W.I. and Wilson claim, city officials had recommended to P.W.I. that it apply for a Water Service Obligation exemption and had argued against P.W.I. and Wilson's motion for a preliminary injunction on the ground that P.W.I.'s exemption application had not yet been determined. Further, P.W.I. and Wilson assert that this issue should have been raised as an affirmative defense by the city or at least set forth in the pretrial order. Finally, P.W.I. and Wilson argue that the trial court erroneously ruled that they should have applied for a "Special Base Allocation" permit because this provision was inapplicable to those holding a "Water Service Obligation."

We do not believe that either Westminster or the trial court attributed to P.W.I.'s failure to apply for a Special Base Allocation permit the significance that P.W.I. and Wilson claim. Westminster merely offered evidence of the Special Base Allocation permit procedure to provide background information about the allocation system and to support its argument that P.W.I. was in effect asking for an open-ended commitment for water and sewer services because it had never yet applied for a building permit. Similarly, the trial court did not rule that P.W.I. "should" have applied for such a building permit but merely noted that its failure to do so evidenced the fact that it still was not ready to proceed with construction. Because this evidence merely illuminated the positions and contentions of the parties, we do not believe it necessary to further address the merits of P.W.I. and Wilson's related arguments on this matter.

legislation in violation of Article II, Section 11 of the Colorado Constitution. Their argument is that the water and sewer tap permits, when combined with the improvements P.W.I. has completed on Phase Two, give rise to a vested right to proceed with construction and to receive water and sewer service free of the restrictions imposed by Ordinance No. 1031, or at least to receive priority under the established allocation system established by Ordinance No. 1031. We disagree.

 Article II, Section 11 prohibits the enactment of a law which is "retrospective in its operation." The test for determining whether a particular law constitutes retrospective legislation centers on whether it "takes away or impairs vested rights acquired under existing laws, or creates a new obligation, imposes a new duty, or attaches a new disability, in respect to transactions or considerations already past." *Denver, South Park & Pacific Railway Company v. Woodward,* 4 Colo. 162, 167 (1878); *accord, e.g., Continental Title Company v. District Court,* 645 P.2d 1310 (Colo.1982); *Jefferson County Department of Social Services v. D.A.G.,* 199 Colo. 315, 607 P.2d 1004 (1980); *Spiker v. City of Lakewood,* 198 Colo. 528, 603 P.2d 130 (1979). A city permit can provide the foundation for a vested right, and thus be constitutionally protected from impairment by subsequent legislation, if the permit holder takes steps in reliance upon the permit. *E.g., Cline v. Boulder,* 168 Colo. 112, 450 P.2d 335 (1969). The issue here, therefore, is whether the water and sewer tap permits issued to P.W.I.'s predecessor by Westminster served as a foundation for any vested rights which Ordinance No. 1031 impaired or took away.

The trial court determined that the issuance of the tap permits to Sabra in 1972 was not a guarantee that water and sewer service would be available indefinitely in the future. In determining that the water and sewer tap permits did not guarantee water and sewer services upon demand in perpetuity, the trial court reasoned as follows:

"The [tap permits] are couched in terms of receipts for payment of fees. Handwritten specifications describing numbers, sizes and unit costs appear, somewhat haphazardly, on the faces of the permits. The City undertakes therein to make certain installations. It has done so. The permits do not guaranty that the utilities for which the installations are intended will be available for any particular period of time. A reasonable implication, considering the purpose of the permits, would be that upon the taps being utilized, water and sewer services will be provided. It is unreasonable, however, to assume that such availability will exist indefinitely. We are dealing with finite commodities."

 The evidence in the record supports the trial court's determination. The tap permits here contained no representation as to the availability of water and sewer services. The evidence indicated that, rather than constituting a mechanism for establishing a right to utility service, the purpose of the tap permits was merely to authorize the installation of the taps at the most convenient phase of construction. Indeed, the ordinance which authorized the issuance of the permits, Westminster, Colo., Ord. No. 592 (1970), expressly provided that no water or sewer tap could be made on any water or sewer main or other portion of the water works or sewer system without first receiving a permit therefor,[11] and that even when the taps were authorized and installed it was unlawful to use any water tap installation until the meter had been set or approved by the city,[12] or to use any sewer tap installation until the work performed was

11. Westminster, Colo., Ord. No. 592 §§ 8–7–2 and 8–8–2 (1970).

12. "It shall be unlawful to use, or permit to be used, any water tap installation until the meter has been set, or approved, by the City." Westminster, Colo., Ord. No. 592, § 8–7–4 (1970).

approved by the city.[13] According to the trial testimony, the city's customary procedure in the case of real estate developments was to set or approve the meter for water tap installations and to approve the sewer tap installations only upon completion of the development.

Any right to water and sewer service under the 1972 tap permits was thus conditioned upon the city's approval of the water and sewer tap installations which, pursuant to the city's customary procedure, would occur only when Phase Two of the development was completed in accordance with the Official Development Plan and Subdivision Agreement. While some change in the construction schedule set forth in these documents was contemplated, it is quite obvious in this case that P.W.I. was incapable of completing Phase Two of the project within any time span reasonably related to the construction schedule agreed upon. The testimony of P.W.I.'s president indicated that P.W.I., due to unfavorable market conditions, has performed no construction on Phase Two since 1975 and has no firm intent to complete the project in the reasonably foreseeable future. Absent the completion of the building project and its approval by the city, as were required by Ordinance No. 592 prior to the lawful use of the taps, the water and sewer tap permits could vest no right in P.W.I. other than the right to the actual physical taps themselves. It is clear in this case that Westminster is not attempting to disturb the taps. In fact, the city has stipulated that P.W.I. will not be assessed the increase that has since been made in tap fees.

Under the circumstances present here, we must reject the claims of P.W.I. and Wilson that the mere completion of some preliminary improvements on Phase Two of the project created a vested right or an unconditional priority to water and sewer services free of the restrictions imposed by Ordinance No. 1031. We also reject, for similar reasons, the argument that the 1972 water and sewer tap permits created a vested right in P.W.I. to building permits under the 1977 allocation system established by Westminster Ordinance No. 1031. In short, we affirm the trial court's determination that Ordinance No. 1031 did not operate as retrospective legislation to deprive P.W.I. and Wilson of any vested right in violation of Article II, Section 11 of the Colorado Constitution.

### III.

P.W.I. and Wilson next assert that Westminster is equitably estopped from denying the availability of water and sewer service for Rancho Pecos. In the context of municipalities, the doctrine of equitable estoppel bars a city from enforcing some obligation by taking a position contrary to a previous representation reasonably relied upon by the party dealing with the city to his detriment. *Crawford v. McLaughlin,* 172 Colo. 366, 473 P.2d 725 (1970); *Franks v. Aurora,* 147 Colo. 25, 362 P.2d 561 (1961). Whether the circumstances in a given case reveal a representation and reasonable reliance so as to give rise to equitable estoppel is a question of fact. *E.g., Roderick v. Colorado Springs,* 193 Colo. 104, 563 P.2d 3 (1977). We believe the trial court's finding that Westminster made no representation that water and sewer services would be available indefinitely, and its further finding that in any event P.W.I. and Wilson did not reasonably rely upon any such representation are amply supported by the record.

As discussed in part II, *supra,* the mere issuance of water and sewer tap permits by Westminster did not serve as a representation that water and sewer service would be available indefinitely. While Westminster did confirm that such services were available in a letter written in August 1973, this letter in no way extended a promise to provide services on P.W.I.'s demand

---

**13.** "It shall be unlawful to use, or permit to be used, any sewer tap installation until the work is approved by the City." Westminster, Colo., Ord. No. 592, § 8–8–4 (1970).

at any unspecified future time. That P.W.I. wrote Westminster in 1975 in order to ascertain the status of the taps indicates, in our view, that it had no reason to believe there had been extended an open-ended commitment by Westminster.[14] Westminster's cautionary response to this letter certainly put P.W.I. on clear notice that utility service was limited. Thus, as the trial court found, if P.W.I. or Wilson relied upon a belief that water and sewer service would be available on demand some three years after the 1975 correspondence and six years after the issuance of the tap permits, this reliance was clearly unreasonable under the circumstances present here. We therefore find no error in the trial court's resolution of the equitable estoppel claim.

### IV.

P.W.I. and Wilson claim that Sabra's payment of the water and sewer tap fees in 1972 insulates them from any obligation to pay the system development and park fees adopted by Westminster in 1974. Their argument proceeds as follows: the tap fees in 1972 were increased incrementally in relation to the number of units to be served by the tap; in 1974, on the other hand, the fee assessment system was changed so that the new park and system development fees increased incrementally in relation to the number of dwelling units, whereas the tap fees, regardless of the number of dwelling units served, increased only if the physical size of the tap increased; therefore, they conclude, the new park and system development fees were actually charged them in 1972 as part of the water and sewer tap permit fees. We are unpersuaded by this argument.

Had the fees imposed upon the issuance of water and sewer tap permits been replaced by the new párk and system development fees, the argument advanced by P.W.I. and Wilson might have merit. The tap fees, however, were not eliminated. In fact the evidence indicates that they have undergone a dramatic increase.[15] Moreover, the park and service development fees are not imposed at the time the tap permits are issued, but instead are linked to the issuance of building permits. In these circumstances the park and service development fees appear to be independent, both in purpose and practical operation, from the water and sewer tap fees.

The bald allegation that the changes in the incremental fees per unit reveal the two sets of fees as merely flip sides of the same coin is insufficient to overcome the facial independence between the ordinances, particularly since the 1974 changes could have been prompted by a number of considerations. The new tap fee system contains a more detailed correlation between the size of the tap and the fee imposed, a change that may have been viewed sufficient by the Westminster City Council to substitute the new fee system instead of imposing an increased fee per unit served by a given tap regardless of its size. Further, there is abundant evidence in the record indicating the rapid growth Westminster sustained in the 1970s. This growth may well have compelled the expansion of or addition to the water and sewer facilities already present in the city, thereby creating a new expense which the city could rationally decide to impose upon new builders. Under these circumstances we believe the allegation that P.W.I. and Wilson are exempt from

---

**14.** In a Wilson inter-office memo dated November 13, 1975, Albert Hannah, Wilson vice president and P.W.I. president stated:

"The other day to my joy and surprise you indicated that prepaid water and sewer tap fees at [Rancho Pecos] had a current value of about $134,000...."

\* \* \* \* \* \*

"If in fact we have available for sale with the 204-unit apartment site all of the prepaid

sewer and water taps, we have a far more valuable commodity than our records may indicate and we thought was true...."

**15.** An exhibit prepared by P.W.I. and Wilson indicates that it would have cost $70,494 in 1980 to buy the same number of water and sewer taps permits which Sabra bought for Phase Two in 1972 for $29,055.

the new fees to be without support and we therefore affirm the trial court's ruling.[16]

## V.

Finally, P.W.I. and Wilson contend that the trial court erroneously added a time limitation to Westminster's stipulation, which exempted P.W.I. and Wilson from increases in tap fees, by adding "a reasonable time" provision within which P.W.I. must elect to apply for a building permit. We reject the contention that the stipulation is binding indefinitely unless expressly limited in duration. This court has repeatedly recognized that, unless otherwise specified, obligations will generally only be binding for a reasonable length of time. *E.g., Twin Lakes v. Bond,* 156 Colo. 433, 399 P.2d 793 (1965); *Colorado Women's College v. Bradford-Robinson Printing Company,* 114 Colo. 237, 157 P.2d 612 (1945); *Denver & Rio Grande Railroad Company v. Doyle,* 58 Colo. 327, 145 P. 688 (1914). What the trial court did here was to make explicit what was implicit in the stipulation. No error occurred in this respect.

The judgment is affirmed.

---

**16.** P.W.I. and Wilson claim, in addition, that they are exempt from the park development fee because P.W.I. dedicated a park to Westminster as provided in the Official Development Plan. The park development fee, however, is expressly to be imposed "in addition to any land contribution requirement." Westminster, Colo., Ord. No. 826, § 1 (1974). In addition, the ordinance expressly provides that credit against the park development fee may be received for "park improvement work, done by the developer." *Id.* at § 4.