23CA2068 Martin Marietta v Boulder County 03-06-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 23CA2068
Boulder County District Court No. 22CV30754
Honorable J. Keith Collins, Judge

---

Martin Marietta Materials, Inc., a North Carolina corporation,

Plaintiff-Appellant,

v.

Boulder County Board of Adjustment, the duly authorized administrative body of a political subdivision of the State of Colorado,

Defendant-Appellee,

and

Save Our Saint Vrain Valley, Inc., a Colorado non-profit corporation, Barbara Cargill, Richard Cargill, and Matt Condon,

Intervenors-Appellees.

---

JUDGMENT AFFIRMED IN PART AND REVERSED IN PART,
AND CASE REMANDED WITH DIRECTIONS

Division IV
Opinion by JUDGE KUHN
Harris and Yun, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced March 6, 2025

---

Otten, Johnson, Robinson, Neff & Ragonetti, P.C., Bill E. Kyriagis, Andrew L.W. Peters, Denver, Colorado, for Plaintiff-Appellant

Ben Pearlman, County Attorney, David Hughes, Deputy County Attorney, Erica Rogers, Assistant County Attorney, Boulder, Colorado, for Defendant-Appellee

Ireland Stapleton Pryor & Pascoe, PC, James R. Silvestro, Denver, Colorado, for Intervenors-Appellees

¶ 1     Plaintiff, Martin Marietta Materials, Inc., appeals the district court's judgment upholding the determinations by defendant, the Boulder County Board of Adjustment (Board), and the Boulder County Land Use Director (Director) that Martin Marietta's special use permit had lapsed.  We affirm in part and reverse in part, and we remand for further proceedings consistent with this opinion.

## I.     Background

¶ 2     Roughly fifty years ago, Western Mobile Boulder, Inc., received a special use permit to mine, process, and transport gravel and sand on a large tract of land in Lyons, Colorado.  The permit was amended several times before the Boulder County Board of County Commissioners passed "Resolution 98-32" in 1998.  The resolution conditionally approved the permit sought in docket "SU-96-18," which, in turn, incorporated all the prior permits.  The resolution authorized the mining special use, along with the various accessory uses that Western Mobile and its successors could use the property for in connection with the special use.

¶ 3     Western Mobile's parent company, Lafarge West, Inc., took over operations at the site and engaged in active mining until approximately 2006.  In November 2011, Lafarge asked the

Colorado Division of Reclamation, Mining, and Safety (DRMS) to put Lafarge's state permit into a temporary cessation status because even though Lafarge's records indicated that "[r]emoval of sand and gravel stockpiled on site ha[d] occurred since 2006," active mining hadn't. DRMS granted this request the following month.

¶ 4 Martin Marietta acquired Lafarge's interests in the property a few days later, and over the following five years, it engaged in various activities directed toward restarting gravel and sand extraction at the site. Then, in 2016 and 2017, the county approved Martin Marietta's requests to relocate certain structures on the property and its site and landscaping plans.

¶ 5 In response to these approvals, intervenors, Save Our Saint Vrain Valley, Inc., and surrounding landowners Barbara Cargill, Richard Cargill, and Matt Condon (collectively, SOSVV), asked the Director to determine whether Martin Marietta's mining permit had lapsed under the Boulder County Land Use Code (Land Use Code).[1] Section 4-604 of the Land Use Code provides, in pertinent part, that a permit lapses "if there has been no activity under any portion of

---

[1] Amanda Dumenigo, another landowner who joined SOSVV's request, is not a party to this appeal.

the special use permit for a continuous period of five years or more." The Director determined that the permit hadn't lapsed under this provision, reasoning that "the approval [resolution] governs not only the mining operations, but also the activities to plan and prepare for mining as well as all necessary post-mining reclamation activities." The Director further explained that "reclamation work, a type of mining-related activity contemplated by the approval [resolution,] has continued without a consecutive [five]-year lapse."

¶ 6    SOSVV appealed, and while the Board and Boulder County District Court both upheld the Director's determination,[2] a division of this court reversed. *See Save Our Saint Vrain, Inc. v. Boulder Cnty. Bd. of Adjustment*, 2021 COA 44, ¶ 57 (*Marietta I*). The division observed that the term "special use permit" referred to the permitted special use (i.e., open pit gravel mining) and not every activity required under the approval resolution. *Id.* at ¶¶ 43-44. For an activity to fall under any portion of the special use permit as

---

[2] Of the five members of the Board, three voted to overturn the Director's determination. But because the Board lacked a supermajority vote, it nonetheless upheld the decision.

contemplated by the lapse provision, the division further reasoned, the activity must either be "directly related to the special use itself, or any authorized accessory uses." *Id.* at ¶ 5. And given that the Director adopted a broader interpretation of the lapse provision when sustaining Martin Marietta's permit, the division concluded that he misconstrued the Land Use Code. *Id.* at ¶ 55.

¶ 7     On remand, the Director reversed his initial determination, reasoning that Martin Marietta's permit had lapsed because no active mining had occurred at the site since 2006, and the company hadn't engaged in any activities directly related to gravel mining. The Director further reasoned that "[b]ecause no mining ha[d] occurred for over fifteen years, it follows that accessory uses [had] also not occurred." Finally, the Director determined that equitable considerations didn't dictate a different outcome. Specifically, he rejected Martin Marietta's argument that the county was equitably estopped from asserting lapse because the county's previous statements suggested that the permit had remained valid.

¶ 8     The Board unanimously affirmed the Director's determination. Then, in accordance with section 4-1201 of the Land Use Code, Martin Marietta appealed the Board's final decision to the district

court under C.R.C.P. 106(a)(4).  The court upheld the Director's determination and the Board's decision.

## II.    Analysis

¶ 9      Martin Marietta contends that the Board erred by upholding the Director's determination that Martin Marietta's mining permit had lapsed because the Director (1) misconstrued and misapplied the division's holding in *Marietta I* and (2) failed to conclude that the county was equitably estopped from enforcing the lapse provision. We address each contention in turn.

### A.    The Director and Board Erred in Their Determinations that Martin Marietta's Permit Had Lapsed Under the Land Use Code

¶ 10     Martin Marietta contends that the Board "exceeded its jurisdiction and abused its discretion when it affirmed the [D]irector's determination that the permit had lapsed."  We agree.

#### 1.    Standard of Review and Applicable Law

¶ 11     "Our review under C.R.C.P. 106(a)(4) is limited to 'a determination of whether the [governmental] body or officer has exceeded its jurisdiction or abused its discretion, based on the evidence in the record before the defendant body or officer.'"  *Langer v. Bd. of Comm'rs*, 2020 CO 31, ¶ 12 (quoting *Ad Two, Inc. v. City &*

5

*Cnty. of Denver*, 9 P.3d 373, 376 (Colo. 2000)); *see* C.R.C.P. 106(a)(4)(I). In doing so, we sit in the same position as the district court and review de novo whether the agency has abused its discretion. *Khelik v. City & Cnty. of Denver*, 2016 COA 55, ¶ 13; *see also Bd. of Cnty. Comm'rs v. O'Dell*, 920 P.2d 48, 50 (Colo. 1996) ("Review of a governmental body's decision pursuant to Rule 106(a)(4) requires an appellate court to review the decision of the governmental body itself rather than the district court's determination regarding the governmental body's decision."). An administrative agency abuses its discretion only when its decision isn't supported by any competent evidence in the record or is based on a misinterpretation or misapplication of the law. *Khelik*, ¶ 13.

¶ 12 No competent evidence means that the decision is "so devoid of evidentiary support that it can only be explained as an arbitrary and capricious exercise of authority." *Langer*, ¶ 13 (quoting *Freedom Colo. Info., Inc. v. El Paso Cnty. Sheriff's Dep't*, 196 P.3d 892, 900 (Colo. 2008)). Thus, "[a]n action by an administrative agency is not arbitrary or an abuse of discretion when the reasonableness of the agency's action is open to a fair difference of

6

opinion, or when there is room for more than one opinion." *Khelik,* ¶ 13.

¶ 13    Similarly, if the language of a municipal code, ordinance, or statute is ambiguous or unclear, we generally give deference to an agency's interpretation of the provision it's charged with enforcing. *Sierra Club v. Billingsley,* 166 P.3d 309, 312 (Colo. App. 2007); *see also Giuliani v. Jefferson Cnty. Bd. of Cnty. Comm'rs,* 2012 COA 190, ¶ 40. Accordingly, while not bound, we may accept the agency's construction of the law if it's reasonable and warranted by the record. *See Sierra Club,* 166 P.3d at 312; *City of Commerce City v. Enclave W., Inc.,* 185 P.3d 174, 178 (Colo. 2008); *see also Whitelaw v. Denver City Council,* 2017 COA 47, ¶ 8 ("While interpretation of a city code is reviewed de novo, interpretations of the code by the governmental entity charged with administering it deserve deference if they are consistent with the drafters' overall intent.").

¶ 14    "In reviewing the agency's construction [of a code], we rely on the basic rules of statutory construction, affording the language of the provisions at issue their ordinary and common sense meaning." *Enclave W., Inc.,* 185 P.3d at 178; *see also* Land Use Code § 1-1000.

7

"Our primary task in interpreting statutes and municipal enactments is to give effect to the intent of the drafters, which we do by looking to the plain language." *Waste Mgmt. of Colo., Inc. v. City of Commerce City*, 250 P.3d 722, 725 (Colo. App. 2010). "If the language of the provision at issue is clear and the intent of the legislative body that enacted it may be discerned with certainty, we may not resort to other rules of statutory interpretation." *Colo. Health Consultants v. City & Cnty. of Denver*, 2018 COA 135, ¶ 13. But if we determine that the language "lends itself to alternative constructions and its intended scope is ambiguous or unclear, we then look to the statute's context, legislative history, prior law, the consequences of a given construction, and the goal of the statutory scheme." *Hotsenpiller v. Morris*, 2017 COA 95, ¶ 19.

## 2. Discussion

¶ 15 Subsection 4-604.C of the Land Use Code sets forth the lapse provision:

> Any approved use by Special Review . . . shall lapse, and shall be of no further force and effect, if the use is inactive for any continuous five-year period or such shorter time as may be prescribed elsewhere in this Code or in a condition of a specific docket's approval. If this period of inactivity occurs, the use may

8

> not be recommended without a new discretionary approval granted under this Code. An approved special use shall be deemed inactive under this Subsection 4-604.C. if there has been *no activity under any portion of the special use permit* for a continuous period of five years or more as a result of causes within the control of the special use permittee or agent.

(Emphasis added.) In *Marietta I,* ¶ 5, the division concluded that this "provision unambiguously requires activity directly related to the special use itself, or any authorized accessory uses, to prevent a lapse."

¶ 16 Martin Marietta argues that the Board abused its discretion when it affirmed the Director's determination that the company's special use permit had lapsed because (1) the property hadn't been mined since 2006 and (2) the absence of mining meant that no qualifying accessory uses had occurred either. Specifically, Martin Marietta contends that, on remand, the Director disregarded the division's decision because he ignored the evidence of the company's test mining activities in 2015. Additionally, Martin Marietta argues that the Director "declined to consider the numerous accessory uses that took place at the [site] since 1998"

9

and, instead, erroneously concluded that such uses couldn't have occurred without an operating principal use.

### a. Whether the Director's Determination is Entitled to Deference

¶ 17    As an initial matter, Martin Marietta argues that we should give no deference to the Director's determination that the purported accessory uses alone were insufficient to preclude a lapse.  Among other things, Martin Marietta asserts that the Director's determination constituted a reinterpretation of the lapse provision that the division in *Marietta I* had already concluded was unambiguous.

¶ 18    But while the division concluded that "authorized accessory uses" may prevent a lapse, it didn't address what that term meant or how it applied to the circumstances of this case.  On remand, the Director was required to decide whether the uses Martin Marietta claimed had occurred on the property were "authorized accessory uses" within the meaning of that term under law.  Answering that question didn't require the Director to reinterpret the lapse provision itself.  Instead, the Director had to interpret "authorized accessory uses" under a separate provision in the Land Use Code

10

and decide under the facts whether Martin Marietta had engaged in qualifying accessory uses.

¶ 19    Regardless, we extend no deference to the Director's interpretation of accessory uses because we conclude next that the relevant provision is unambiguous.  *See Sierra Club*, 166 P.3d at 312.

> b.    The Director Abused His Discretion When He Failed to Examine Whether Martin Marietta's Claimed Accessory Uses Precluded the Permit's Lapse

¶ 20    In challenging the Director's determination regarding accessory uses, Martin Marietta asserts, among other things, that the division "specifically instructed the Director to consider accessory uses as an independent basis to prevent lapse."  Despite this instruction, Martin Marietta further contends, "[t]he Director improperly disregarded as irrelevant evidence of all accessory uses — even those expressly identified and authorized in the Permit — because he . . . concluded that accessory uses could not occur without an operating primary use."  We agree with Martin Marietta that this was an error.

¶ 21    The Director acknowledged that, in *Marietta I*, the division had instructed him to consider on remand whether Martin Marietta had

11

engaged in any authorized accessory uses sufficient to preclude the permit's lapse.  The Director further acknowledged that the resolution approved certain activities as accessory to the principal gravel mining special use.  But he also noted that those enumerated uses must comply with section 4-516 of the Land Use Code to be considered authorized accessory uses.  Accordingly, the Director reasoned that the activities Martin Marietta contended were accessory must "be customary and incidental to the principal use of the property, which is gravel mining."  And after the Director found — with record support — that the property hadn't been used for gravel mining since 2006,[3] he concluded that authorized accessory uses also hadn't occurred because such uses "cannot exist separate and apart from the principal use."  But we think that this conclusion draws too bright a line.

---

[3] Contrary to Martin Marietta's argument, competent evidence in the record supports this factual finding.  For example, the communications and annual reports that Martin Marietta and its predecessor submitted to the DRMS indicated that no excavations had occurred since at least 2006.  Similarly, the declaration Martin Marietta submitted in support of its briefing to the Director stated that "Lafarge physically extracted sand and gravel at the Lyons Pit pursuant to the Entitlements until at least 2006."

¶ 22    Section 4-516 of the Land Use Code governs accessory uses. It provides that "[a]n accessory use must be a use customarily incidental to and on the same parcel as the main use."  Land Use Code § 4-516.  Because the Land Use Code doesn't define "customarily" or "incidental," we look to the plain meaning of these words.  *See Enclave W., Inc.*, 185 P.3d at 178; *see also Edwards v. New Century Hospice, Inc.*, 2023 CO 49, ¶ 20.  Merriam-Webster defines "customary" as "commonly practiced, used, or observed."  Merriam-Webster Dictionary, https://perma.cc/U7PD-LXDZ.  And the term "incidental" is defined in Black's Law Dictionary as "[s]ubordinate to something of greater importance[,] having a minor role."  Black's Law Dictionary 908 (12th ed. 2024).  Considering the plain and ordinary meaning of these terms, then, a use is deemed accessory under the Land Use Code only if it supports the principal use.

¶ 23    Other language in section 4-516 supports this interpretation. For example, one provision defines an accessory structure as "[a] subordinate structure detached from, but located on, the same lot as the Principal Use, the use of which is incidental and accessory to that of the Principal Use."  Land Use Code § 4-516.M.1.  Similarly,

13

several other provisions state that an accessory use must be in the service of an active principal use. For example, a provision allowing accessory agricultural composting states that the location of the composting must be a certain distance away from where the agricultural operation *is occurring*. Land Use Code § 4-516.A.5.c. And section 4-516.E.1 allows "accessory chicken keeping" for the purpose of "[r]aising chicken hens primarily for the people *living* on the parcel." (Emphasis added.) These provisions — considered in context with the definition of accessory uses — support the Director's conclusion that accessory uses can't exist independently from the principal use. *See* Land Use Code § 1-1000.A.1 (stating that "[w]ords and phrases shall be read in context").

¶ 24     However, we also view as too stark the Director's conclusion that "[b]ecause no mining ha[d] occurred for over fifteen years, it follows that accessory uses have also not occurred." This conclusion implies that a use is no longer considered an accessory use as soon as the principal special use stops, even if only briefly so. But while an accessory use can't exist independently from the principal use, the two terms are also not coextensive. If that were the case, the *Marietta I* division could have decided the issue of

14

lapse given that it was "undisputed that no 'active mining' ha[d] occurred since at least 2006." *Marietta I*, ¶ 15. Instead, the division remanded the matter to the Director to consider whether Martin Marietta had engaged in activities "directly related to the special use itself, *or* any authorized accessory uses, to prevent a lapse." *Id.* at ¶ 5 (emphasis added). The Director's conclusion that, in essence, the accessory uses and principal use are coextensive runs afoul of this instruction because it collapses two distinct categories of activities into one.

¶ 25     Instead, the determination whether a particular activity qualifies as an accessory use doesn't solely hinge upon the status of the principal use. The relevant inquiry is whether the purported accessory use activity supports the principal use. Put differently, an activity is no longer an accessory use when it stops supporting the principal use, not when the principal use itself stops. For example, the parties argue about the status of a gravel pile at the mine site. It's true that stockpiling may constitute an accessory use if the operator paused active mining but continued processing and hauling gravel from its stockpiled materials. But it's also true that the same pile of gravel wouldn't qualify as an accessory use if it was

15

simply sitting abandoned on the property. At bottom, whether a particular activity is an accessory use under the circumstances is a question of fact that must be evaluated by considering whether the activity was done in service of the principal use at the time it was allegedly conducted. Here, the Director erred to the extent he concluded that the absence of mining automatically meant that no accessory use had occurred on the property.

¶ 26　And the record shows that this legal conclusion effectively ended the Director's inquiry. He did not go on to factually consider whether the activities Martin Marietta claimed had occurred on the site amounted to accessory uses under the circumstances of this case.

¶ 27　In its briefing to the Director and on administrative appeal, Martin Marietta asserted that, along with its predecessors, it had engaged in the following accessory uses at the property: (1) maintenance of outside storage and equipment; (2) stockpiling and hauling of mined materials; (3) maintenance of a portable office; (4) maintenance of a low-water crossing and conveyor bridge; (5) groundwater monitoring; (6) "2015-16 facility upgrades and additional storage"; and (7) "[g]rading, right-of-way construction,

16

[and] other 'activities to plan and prepare for mining.'" The first four activities are listed as accessory uses in the approval resolution. The resolution also identifies as authorized accessory uses, among other things, the (1) storage of fuel, oil, and grease; (2) the "use of a portable crusher and screen"; (3) "processing of sand and gravel including crushing, screening, [and] washing"; and (4) the use of a railroad and state highway for the purpose of hauling the extracted materials.

¶ 28    The resolution approved these accessory uses "provided that all applicable regulations of [section] 4-516 of the [Land Use Code], as amended, are met." *See also Marietta I*, ¶ 48 (noting that the quoted "language conditions the accessory use upon meeting the regulations established by the County"). And section 4-516 of the Land Use Code requires, among other things, that an accessory use must be "customarily incidental to and on the same parcel as the main use."

¶ 29    The problem with the Director's decision is that although he *discussed* some of the uses that Martin Marietta claims were authorized accessory uses under the Land Use Code, he failed to

17

make factual findings about them or conclude whether they in fact

met the standard.  In his decision, the Director said that

> [f]or example, the Code allows an accessory
> structure on a property, so long as its use "is
> incidental and accessory to that of the
> Principal Use."  4-516.L.1 of the Code.  The
> mere fact that an additional structure exists
> [on] a property does not make it an accessory
> structure if it is not being used as an
> accessory to the principal use.
>
> The accessory uses approved by the Resolution
> include "[o]utside storage, and the storage of
> fuel, oil, and grease, as well as the repair of
> equipment and machinery, and portable
> offices" and "use of a portable crusher and
> screen, and accessory processing of sand and
> gravel including crushing, screening, washing,
> and stockpiling."  In order to comply with the
> Code, these uses must be customary and
> incidental to the principal use of the property,
> which is gravel mining.  The mere fact that
> items were stored on the site, or that these
> uses may have occurred in some form, does
> that [sic] make them authorized accessory
> uses under the Resolution, absent them being
> customary and incidental to the main use of
> the property.

¶ 30     But the Director didn't go on to address each of these claimed

activities, make findings about them, and conclude *why* each

activity was or wasn't accessory to the principal special use.  In

other words, the Director didn't decide whether Martin Marietta's

18

claimed activities were accessory uses under the circumstances of this particular case.

¶ 31     For example, the Director stated that "[t]he mere fact that an additional structure exists [on] a property does not make it an accessory structure if it is not being used as an accessory to the principal use." We agree with this statement as far as it goes. But the Director didn't conclude whether *this* structure was being used as an accessory to the principal use. And while we understand that there was no active mining at the time, that doesn't necessarily mean that Martin Marietta wasn't using the additional structures as part of a mining operation. That is a factual finding that the Director would have to make.

¶ 32     Likewise, the Director also noted that "[t]he mere fact that items were stored on the site, or that these uses may have occurred in some form, does [not] make them authorized accessory uses under the [r]esolution, absent them being customary and incidental to the main use of the property." But the Director didn't reach a conclusion about why the items were stored on this site. The same is true for the maintenance of a portable office and outside storage and maintenance of equipment.

¶ 33    The Director also didn't address, let alone make factual findings about, other claimed activities. For example, Martin Marietta argued that stockpiling and hauling of mined materials, maintenance and use of the low-water crossing and conveyor bridge, and the 2015-2016 facility upgrades were sufficient to prevent lapse. The Director didn't substantively address these claims.

¶ 34    Finally, Martin Marietta argued that its work in dewatering Pond 3 and "conducting excavations in ten different areas on-site" in 2015 amounted to open pit mining, the special use allowed under the permit.[4] The Director determined that the test excavations couldn't preclude a lapse because they occurred more than five years after mining last occurred on the site, and Martin

---

[4] SOSVV argues that Martin Marietta should not be able to pursue this argument on appeal because it conceded that there was no "active mining" on the site in *Marietta I*. We disagree. It does appear that it was "undisputed" at the time *Marietta I* issued that active mining hadn't occurred on the site since 2006. But that concession in combination with the record in this case is not enough to foreclose Martin Marietta's argument on appeal. At bottom, it is a factual question what the test excavations qualify as under the Land Use Code. Even if they don't represent "active mining," the Director will have to decide on remand whether the test excavations are activity directly related to the special use, evidence of an accessory use, or something else entirely.

Marietta didn't offer any explanation for the almost decade-long gap in mining operations. That may be true, but again it requires factual findings that are missing from this record.

¶ 35    The Director's determination on this point was tied to his conclusion that no accessory uses could exist apart from the permitted special use. After deciding that no accessory uses could have occurred after the last mining in 2006, the Director then concluded that the test excavations in 2015 couldn't have prevented a lapse. But that's only true if there were no other activities between 2006 and 2015 that would have also prevented a lapse. If, for example, Martin Marietta had engaged in accessory uses in 2009 and 2013, then test excavations could well have prevented a lapse after 2015. We therefore conclude that the Director will have to reevaluate Martin Marietta's claims about the test excavations along with its claimed accessory uses.

¶ 36    The Board's decision likewise doesn't contain findings on Martin Marietta's claimed uses. The Board upheld the Director's determination on administrative appeal without examining each of the claimed accessory uses and without making an independent factual record. It concluded that Martin Marietta's alleged activities

on the site weren't sufficient to sustain the permit "based on the entirety of the record presented to [it]." While this isn't in any way inappropriate, it means that the Board's decision doesn't provide a basis to change our conclusion.

¶ 37    We reject the Director's legal conclusion that an accessory use *automatically* cannot exist when the permitted special use is dormant. As we have explained, whether an accessory use is nonetheless incidental to the dormant special use is a fact-intensive inquiry that requires examination of all the circumstances. And because the Director didn't analyze the claimed accessory uses on the merits or make any findings in support of his determination that Martin Marietta's permit had lapsed, we're unable to discern a factual basis for that determination and decide whether it rises to an abuse of discretion. *See People in Interest of J.L.*, 121 P.3d 315, 318 (Colo. App. 2005) (we have no basis for conducting a meaningful review when the trial court doesn't make factual findings). The Board's decision necessarily meets the same fate. Accordingly, we reverse the Director's determination — and the Board's decision upholding it on administrative appeal — and remand the case to the Director so that he may make factual

22

findings and reach a conclusion on the merits about whether

Martin Marietta's activities constituted authorized accessory uses

(or a continued special use in the case of test excavations) barring

the lapse. By doing so, we express no opinion as to the merits of

Martin Marietta's claim.[5]

## B. Equitable Estoppel

¶ 38    Martin Marietta next contends that the Director erred when he

concluded that equitable considerations didn't preclude the permit's

lapse. We disagree.

### 1. Applicable Law and Standard of Review

¶ 39    "The doctrine of equitable estoppel is premised upon principles

of fair dealing and is designed to prevent manifest injustice." *Ward*

*v. Dep't of Nat. Res.*, 216 P.3d 84, 93 (Colo. App. 2008) (citation

---

[5] Martin Marietta also asserts that the Director "misinterpreted and misapplied the Code when considered against the four factors set forth in [section] 4-1202.A.1." Specifically, it contends that the Director's interpretation of the lapse provision conflicts with (1) the provision's technical meaning; (2) the evidence regarding the provision's past interpretation; (3) the rules of interpretation; and (4) "both the intent of the Code and the Boulder County Comprehensive Plan to guide future growth, development, and distribution of land uses within Boulder County." But as we have already noted, the Director's role on remand was limited to the application, and not interpretation, of the lapse provision. This argument thus misses the mark.

omitted). While this doctrine may be invoked against a municipality, such an invocation isn't as free as it would be against an individual. *See Colo. Health Consultants*, ¶ 39. "In the context of municipalities, the doctrine of equitable estoppel bars a city from enforcing some obligation by taking a position contrary to a previous representation reasonably relied upon by the party dealing with the city to [the party's] detriment." *P-W Invs., Inc. v. City of Westminster*, 655 P.2d 1365, 1372 (Colo. 1982).

¶ 40    Accordingly, a party alleging equitable estoppel must show that

> the party against whom the estoppel is asserted must know the [relevant] facts; that party must also intend that its conduct be acted upon or must lead the other party to believe that its conduct is so intended; the party claiming estoppel must be ignorant of the true facts; and the party asserting the estoppel must detrimentally rely on the other party's conduct.

*Jefferson Cnty. Sch. Dist. No. R-1 v. Shorey*, 826 P.2d 830, 841 (Colo. 1992); *see also Colo. Health Consultants*, ¶ 40.

¶ 41    "Whether the circumstances in a given case reveal a representation and reasonable reliance so as to give rise to

equitable estoppel is a question of fact."[6] *P-W Invs.*, 655 P.2d at 1372; *see also Kruse v. Town of Castle Rock*, 192 P.3d 591, 603 (Colo. App. 2008). We accept findings of fact on review unless they are so clearly erroneous as not to find support in the record. *Colo. Health Consultants*, ¶ 38.

### 2.    Discussion

¶ 42    Martin Marietta contends that it "reasonably relied on the [c]ounty's representations regarding the ongoing validity of the

---

[6] SOSVV and Martin Marietta dispute the applicable standard of review. Relying on the quoted language from *P-W Investments, Inc. v. City of Westminster*, 655 P.2d 1365, 1372 (Colo. 1982), SOSVV asserts that "[w]ithin the context of a C.R.C.P. 106 appeal, a government body's findings of fact and determination regarding equitable estoppel must be upheld so long as it was not an abuse of discretion." Martin Marietta argues that because "*P-W* treats a review of equitable reliance as an application of law to fact," the proper standard of review is whether the Director's decision rejecting the equitable estoppel claim has reasonable basis in law. We need not resolve this dispute because we conclude below that the Director didn't err regardless of which standard applies.

[p]ermit since" it acquired the mine in 2011.[7]  Specifically, Martin

Marietta argues that the county is equitably estopped from

enforcing the lapse provision because Martin Marietta spent over

$750,000 in reasonable reliance on

- a November 2011 letter, in which the county informed

    Martin Marietta that, among other things, "[t]here [didn't]

    appear to be any outstanding/open zoning or building code

    violations that appl[ied] to the subject property" at that

    time;

- a provision in the assignment agreement through which

    Martin Marietta acquired Lafarge's lease interest in the

---

[7] Martin Marietta also argues that its permit hasn't lapsed because circumstances outside of Martin Marietta's control prevented it from restarting mining operations.  Specifically, Martin Marietta contends that "[l]arge-scale mining would have begun shortly after Martin Marietta's acquisition if not for: (1) the 2013 floods, which significantly delayed mine preparation activities . . . , and (2) [Boulder County's] decision to defer its processing of the final applications since 2017."  While Martin Marietta presents this issue in the part of the opening brief discussing equitable considerations, it seeks relief under the language of section 4-604 providing that the qualifying period of inactivity must be "a result of causes within the control of the special use permittee or agent."  But this argument implicates whether Martin Marietta's permit should be sustained under the lapse provision, under which we reverse for reconsideration above, not under the equitable estoppel doctrine.

property that provided the county consented to the assignment and that certain agreements between the county and Martin Marietta's predecessors remained in full force and effect;

- an August 2016 letter approving Martin Marietta's request for relocation of certain buildings and processing equipment on the property; and

- a January 2017 letter, in which the county approved Martin Marietta's site plan and landscaping plan that it submitted in connection with the previously approved relocation request.

We're not persuaded.

¶ 43 As an initial matter, we note that Martin Marietta argues for the first time in this appeal that the county's consent to the assignment agreement amounted to a representation regarding the permit's ongoing validity. But as the Board and SOSVV both point out, Martin Marietta didn't raise this argument in the administrative proceedings or the district court. In support of preservation, Martin Marietta contends that this issue constitutes

"additional record evidence" "as part of its larger estoppel argument," not a new argument.  But this misses the point.

¶ 44    By merely asserting an equitable estoppel claim, Martin Marietta didn't preserve for our review every possible estoppel argument that may have some record support and regardless of whether that argument was presented during the administrative proceedings.  Instead, Martin Marietta was still required to identify the "additional record evidence" supporting its equitable estoppel claim and give the Director and the Board an opportunity to address that issue.  *See Cuevas v. Pub. Serv. Co. of Colo.*, 2023 COA 64M, ¶ 35 n.3 (noting that although parties are not required to use "talismanic language" to preserve issues for appeal, the district court must be presented with an adequate opportunity to make findings of fact and conclusions of law on the issue (quoting *People v. Melendez*, 102 P.3d 315, 322 (Colo. 2004))) (*cert. granted in part* July 1, 2024).  Because Martin Marietta failed to do that, this argument is waived, and we decline to address it further.  *See Abromeit v. Denver Career Serv. Bd.*, 140 P.3d 44, 53 (Colo. App. 2005) (concluding that the district court properly declined to address a party's equitable estoppel claim in the C.R.C.P. 106

action where that claim wasn't raised in the administrative proceedings).

¶ 45   And like the Director, we also conclude that the remaining communications don't satisfy the elements of equitable estoppel. Specifically, none of the communications included representations from the county that, at the time they were made, Martin Marietta's permit hadn't expired. Rather, they concerned issues unrelated to the potential lapse.

¶ 46   The November 2011 letter informed Martin Marietta that there were no zoning or building violations on the property at the time; it didn't contain any statements regarding the permit's validity. We're unpersuaded by Martin Marietta's argument that "the [c]ounty's representation concerning zoning violations . . . directly addresses the [p]ermit's validity" because if the permit had lapsed by the time of the letter, all operations on the property would have necessarily constituted a violation of the Land Use Code. As the Director noted, "The lapse of a special use permit is not a zoning violation. A zoning violation is an activity or use on a property that violates the terms and conditions of the [Land Use] Code." Accordingly, the November 2011 correspondence was limited to the status of any

29

zoning or building violations on the property, regardless of whether the permit had already lapsed by that time.

¶ 47    The August 2016 and January 2017 letters were similarly limited in scope. The county merely communicated in the first that Martin Marietta's relocation request had been approved and in the second that its site plan and landscaping plan had been approved.

¶ 48    In arguing otherwise, Martin Marietta asserts that the 2016 correspondence was a representation that the permit was valid because by stating that the county planner's determination was "[b]ased on [her] research of the docket," she suggested that she had reviewed all aspects of the permit before granting the request. But as the Director observed, the planner's review of the docket was clearly limited to Martin Marietta's relocation proposal and didn't entail a consideration of "the history of mining activity on the parcel to determine whether the Permit had lapsed."

¶ 49    We're likewise not persuaded by Martin Marietta's contention that the January 2017 "approval was necessarily a representation that the [site] plan was consistent" with the lapse provision given that the plan proposal had to comply with all provisions of the Land Use Code. While section 4-806 of the Land Use Code states that a

30

site plan proposal must be consistent with its provisions, we don't see approval of that proposal as a confirmation that the special use permit itself is valid. Whether or not Martin Marietta's permit had lapsed wasn't at issue in the site plan application. Accordingly, an argument that the county asserted a position on this issue solely by approving the application unduly stretches the bounds of the equitable estoppel doctrine that is generally disfavored and applied only in limited circumstances. *See Santich v. VCG Holding Corp.*, 2019 CO 67, ¶ 7.

¶ 50     In sum, the record shows that Martin Marietta didn't ask for — and the county didn't make — a determination about whether the permit had remained valid under the lapse provision. Indeed, the Director addressed this specific question later in response to

SOSVV's request.[8]  Before that, the county only referred to the lapse

provision in a 2006 letter it sent to Lafarge:

> Please note that Subsection 4-604.C. requires
> that a special use permit expires if the use is
> inactive for any continuous five-year period.
> While we do not now have information that
> such a lapse has occurred, it could occur in
> the future.  Lafarge and any subsequent owner
> should be aware of this limitation.

¶ 51     The above record shows that, in the communications Martin

Marietta directs us to, the county didn't consider the applicability of

the five-year lapse provision to the circumstances of this case.  And

when the county addressed that provision in the 2006 letter, it

didn't tell Martin Marietta's predecessor that the permit hadn't

lapsed.  To the contrary, it warned the predecessor that, while the

county had no information that the permit had lapsed, such a lapse

---

[8] To the extent Martin Marietta argues that equitable estoppel
applies because the Director's determination on remand conflicts
with his initial determination and the county's position in the
letters, we disagree.  The Director was required to reconsider the
issue of lapse in light of the *Marietta I* division's decision to reverse
his initial determination and remand the matter for further
proceedings.  Then, on remand, the Director reached a different
conclusion in reliance on the standard articulated in *Marietta I.*
Thus, even if Martin Marietta believes that the county flip-flopped
on its previous position in connection to the lapse provision, this
record undercuts that argument.

could occur in the future. The county then reaffirmed this position in the January 2017 correspondence by enclosing the 2006 letter and stating that its contents remained in effect.

¶ 52    Thus, contrary to Martin Marietta's assertion, this is not a case where the county said that the permit hadn't lapsed and then reversed course. *Cf. Hargreaves v. Skrbina*, 662 P.2d 1078, 1079-81 (Colo. 1983) (concluding that a city was equitably estopped from enforcing a setback requirement under a zoning code against a party who wasn't aware of the requirement and who acted "in reliance on their building permit and the [c]ity's failure to revoke it after the violation became known"); *Eason v. Bd. of Cnty. Comm'rs*, 70 P.3d 600, 605-06 (Colo. App. 2003) (concluding that a county deprived a party of "a protected interest in property within the meaning of the Due Process Clause" where the county contradicted its prior express representation that a particular use of the property was permitted under the zoning ordinance). And while, in Martin Marietta's words, the county may have "acted to foster, not oppose, commercial mineral extraction" by approving the improvement requests, that conduct likewise didn't equate to a representation that the permit wasn't subject to a potential lapse. After all, it was

incumbent upon Martin Marietta as the operator of the mine to ensure that its operations complied with all aspects of the Land Use Code, including section 4-604.

¶ 53    Considering this record, we agree with the Director that Martin Marietta can't establish "that it changed its position, to its detriment, in justifiable reliance on the county's conduct." And because Martin Marietta can't establish one of the elements of equitable estoppel, this claim fails. *See Santich*, ¶ 7 (noting that the doctrine of equitable estoppel applies only when *all* elements constituting an estoppel are clearly shown).

### III.    Disposition

¶ 54    The district court's judgment is affirmed in part and reversed in part, and the case is remanded for further administrative proceedings consistent with this opinion. Specifically, the Director and the Board must consider on the merits whether Martin Marietta's claimed activities since 2006 prevented a lapse of the special use permit.

JUDGE HARRIS and JUDGE YUN concur.